IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

KENNETH LAKE, CRYSTAL LAKE,    )    CIVIL 16-00555 LEK
HAROLD BEAN, MELINDA BEAN,     )
KYLE PAHONA, ESTEL PAHONA,     )
TIMOTHY MOSELEY, and ASHLEY    )
MOSELEY,                       )
                               )
          Plaintiffs,          )
                               )
     vs.                       )
                               )
OHANA MILITARY COMMUNITIES,    )
LLC, FOREST CITY RESIDENTIAL   )
MANAGEMENT, INC.; and DOE      )
DEFENDANTS 1-10,               )
                               )
          Defendants.          )
_____ )


**ORDER DENYING DEFENDANTS' MOTION TO DISQUALIFY COUNSEL
AND/OR FOR SANCTIONS AND DENYING PLAINTIFFS' MOTION FOR REMAND**

On October 28, 2016, Defendants Ohana Military

Communities, LLC ("Ohana") and Forest City Residential

Management, LLC ("Forest City" and collectively, "Defendants")

filed their Motion to Disqualify Counsel and/or for Sanctions

("Motion to Disqualify").[1]  [Dkt. no. 12.]  On November 10, 2016,

Plaintiffs Kenneth Lake, Crystal Lake, Harold Bean, Melinda Bean,

Kyle Pahona, Estel Pahona, Timothy Moseley, and Ashley Moseley,

for themselves and on behalf of all others similarly situated

---

[1] Defendants state that Forest City Residential Management,
LLC is the successor by conversion to Forest City Residential
Management, Inc.  [Motion to Disqualify at 2.]  Forest City
Residential Management, Inc. is the entity named in the Complaint
and reflected in the case caption.

("Plaintiffs"), filed their Motion for Remand.  [Dkt. no. 25.]

Plaintiffs filed their memorandum in opposition to the Motion to

Disqualify ("Disqualification Opposition") on November 15, 2016,

and Defendants filed their reply ("Disqualification Reply") on

November 22, 2016.  [Dkt. nos. 32, 36.]  Defendants filed their

memorandum in opposition to the Motion to Remand ("Remand

Opposition") on November 21, 2016, and Plaintiffs filed their

reply ("Remand Reply") on November 28, 2016.  [Dkt. nos. 34, 39.]

        These matters came on for hearing on December 12, 2016.

On February 28, 2017, this Court issued an entering order stating

that both motions were denied ("2/28/17 EO Ruling").  [Dkt. no.

48.]  The instant Order supersedes the 2/28/17 EO Ruling.  After

careful consideration of the motions, supporting and opposing

memoranda, the arguments of counsel, and the relevant legal

authority, Defendants' Motion to Disqualify and Plaintiffs'

Motion for Remand are both HEREBY DENIED for the reasons set

forth below.  The denial of the Motion to Disqualify is WITHOUT

PREJUDICE.

## BACKGROUND

        Plaintiffs filed their Complaint in the State of

Hawai`i First Circuit Court ("state court") on September 14,

2016.  Defendants filed its Notice of Removal on October 13,

2016.  [Dkt. no. 1.]  Defendants asserted the following grounds

for removal: federal question jurisdiction, pursuant to 28 U.S.C.

2

§ 1331, because the claims arose on a federal enclave; and jurisdiction under 28 U.S.C. § 1442(a)(1) because either Ohana was acting as a United States agency or "Defendants were 'person[s] acting under [a federal] officer.'"  [Notice of Removal at ¶ 5 (alterations in Notice) (quoting § 1442(a)(1)).]

The Complaint alleges that Plaintiffs leased housing on the Kaneohe Marine Corp Base Hawaii ("MCBH") from Defendants after 2006.  They had various lease terms, the earliest starting in August 2008.  Plaintiffs Kyle and Estel Pahona are current residents, and all of the other Plaintiffs are former residents, the latest of them leaving MCBH in December 2015.  [Notice of Removal, Decl. of Christine A. Terada, Exh. 1 (Complaint) at ¶¶ 149-54.]

Plaintiffs allege that Defendants are "engaged in the joint-enterprise of developing privatized military housing at MCBH, marketing and sales of residential leases, sales of renter's insurance policies, providing property management and maintenance services."  [Id. at ¶ 157.]  Plaintiffs note that, in 1996, the Military Housing Privatization Initiative ("MHPI") "authorized legislation to privatize military housing whereby private companies were allowed to own and manage housing on military bases."  [Id. at ¶ 159.]  Among other things, the MHPI provides a Basic Allowance for Housing ("BAH") for service members who do not receive government housing.  A service member

3

can use the BAH to pay for private housing, either on the military base or off-base. [<u>Id.</u> at ¶ 161.e.]

According to the Complaint, Ohana "was created to renovate and construct new housing at" MCBH, [<u>id.</u> at ¶ 160,] and Forest City is Ohana's agent that "manage[s] residential housing at MCBH on Ohana's behalf under the term of Ohana's lease with military families." [<u>Id.</u> at ¶ 161.] Ohana, through Forest City, "provides services to military families at MCBH related to the marketing, sale, and management of residential leases, sale of renter's insurance policies, and provision of property management and maintenance programs." [<u>Id.</u> at ¶ 161.b.] The terms of the MCBH leases require Ohana to "provide safe and habitable housing." [<u>Id.</u> at ¶ 164.b & n.6 (citing Ohana's Exemplar Lease Agreement at 5, ¶ 12).]

Ohana began leasing new and previously constructed housing on MCBH to military families in approximately 2006. Plaintiffs allege that the "older residential housing at MCBH contained asbestos, lead-based paint, extensive mold infestation, and other toxins." [<u>Id.</u> at ¶ 165.] Ohana also began demolition of older housing units to build new units for future lease, and – according to the Complaint – the demolition work was continuing at the time Plaintiffs filed the Complaint. [<u>Id.</u>] Plaintiffs allege that, even before Ohana assumed control of the MCBH housing, Ohana was warned by a contractor that had previously

4

been hired to perform the same work "that MCBH soils had been

found that were contaminated with pesticides including chlordane,

heptachlor, and heptachlor epoxide, and that all contaminated

topsoil should be removed in addition to other measures."[2]  [Id.

_____

[2] These chemicals are referred to as organo-chlorinated
pesticides ("OCPs").  As background about the use of OCPs on
Oahu, Defendants state:

> OCPs are common termiticides that were widely used
> for termite control throughout the United States
> from the mid-1940s to the late 1980s.  See DOH,
> Past Use of Chlordane at 1 (Sept. 2011) available
> at http://eha-web.doh.hawaii.gov/eha-
> cma/Downloads/HEER/termiticidefactsheetfinalsept20
> 11.pdf.  Because OCPs were designed to break down
> slowly over time, they are still present around
> homes throughout Hawai`i.  See id.  As the United
> States Department of Health and Human Services has
> noted, "chlordane use extended from the lower New
> England States south and west to California. . . .
> Over 50 million persons have lived in chlordane-
> treated homes."  U.S. Dept. of Health,
> Toxicological Profile for Chlordane at 3-4 (May
> 1994) available at https://www.atsdr.cdc.gov/
> toxprofiles/tp31.pdf.

> DOH has established a two-tiered system for
> analyzing sites with OCPs when they are
> redeveloped.  Tier 1 [environmental action levels
> ("EALs")] are screening levels that are so low
> that sites with OCPs at these levels are
> considered safe for all circumstances without any
> further analysis or remediation.  See DOH,
> Evaluation of Environmental Hazards, Vol. 1,
> §§ 2.1, 2.4.1 (Fall 2011; rev. Jan. 2012)
> available at http://eha-web.doh.hawaii.gov/eha-
> cma/documents/8935e423-25fb-46b9-adaa-
> fc0a207d5518.  Because the Tier 1 EALs are
> designed to be rapid evaluation criteria,
> "[e]xceeding the Tier 1 EAL for a specific
> chemical does not necessarily indicate that the
> (continued...)

at ¶ 166 (emphasis omitted).]  Defendants were also aware of

contamination from aldrin, dieldrin, and endrin.  [Id. at ¶ 171.]

The pesticide levels "were many times higher than the

[Environmental Protection Agency's ('EPA')] Tier 1 environmental

action levels ('EAL')" and Tier 2 EALs.  [Id. at ¶¶ 167, 171.]

Defendants, however did not disclose the contaminated soils in

marketing, leasing, managing, and maintaining the residential

units.  [Id. at ¶¶ 168, 171.]

Ohana confirmed the pervasive soil contamination

through additional testing until it "concluded that all

neighborhoods at MCBH should be assumed to contain pesticide

impacted soils beneath all existing foundations and all

surrounding perimeters."  [Id. at ¶ 170 (emphasis omitted).]

Defendants therefore created a Pesticide Soils Management Plan

("Soil Plan"), with input from the State of Hawai`i Department of

Health ("DOH").  [Id. at ¶ 172.]  The Soil Plan included Tier 2

---

[2](...continued)
     contamination poses significant environmental
     concerns, only that additional evaluation is
     warranted."  Id. at vii (emphasis added).  If a
     site has a Tier 1 exceedance, DOH requires a site-
     specific evaluation to determine whether there are
     environmental hazards and whether any action is
     necessary.  See id., §§ 1.6, 3.  As part of this
     evaluation, DOH and the site owner often create
     new Tier 2 EALs as an alternative to DOH's generic
     Tier 1 EALs.  See id.

[Mem. in Supp. of Motion to Disqualify at 6-7 (some alterations
Defendants').]

EALs for the pesticides at issue in this case that were "above

the Tier 1 EALs . . . based on the flawed assumption that

military families would not live at MCBH longer than 6 years."

[Id. at ¶ 172.a.]  Plaintiffs emphasize that this means "that

military families are exposed to higher excess cancer/non-cancer

risks of at least 'one in one-hundred thousand' (10-5) rather

than the regular Tier 1 level of less than a 'one-in-a-million'

excess risk."  [Id. at ¶ 172.b.]  The Soil Plan also included:

-recommended remediation practices to address the contaminated
     soils, for example, "confirming that 'no visible dust'
     should occur during demolition and construction"; [id. at
     ¶ 173.c;]

-a statement that maps showing where contaminated soils had been
     found and addressed would be maintained and made available
     to the Department of the Navy ("the Navy"), the MCBH
     management, and the DOH; [id. at ¶ 173.d;] and

-a statement that residents would receive written notice anywhere
     contaminated soils may be present [id. at ¶ 173.e].

Plaintiffs allege that Defendants assumed existing leases and

entered into new leases without disclosing the soil

contamination, the Soil Plan, or the fact that the contamination

increased cancer risks for MCBH residents.  Plaintiffs also

allege that Defendants failed to follow the Soil Plan.  [Id. at

¶¶ 175-76.c.]

          When Plaintiffs discovered Defendants' failure to

disclose the soil contamination, Plaintiffs made a demand for

mediation under the terms of their leases to address the failure

to disclose the contamination and the failure to provide safe and habitable housing from 2005 to the present.  [Id. at ¶¶ 178-79.]

The Complaint alleges the following claims: breach of contract against Ohana ("Count I");[3] breach of the implied warranty of habitability against Ohana ("Count II"); a claim against Defendants for violation of the Landlord Tenant Code, Haw. Rev. Stat. Chapter 521 ("Count III"); an unfair and deceptive trade practices ("UDAP") claim against Defendants pursuant to Haw. Rev. Stat. § 480-2 ("Count IV"); a negligent failure to warn claim against Defendants ("Count V"); a claim for negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED") against Defendants ("Count VI"); a fraud claim against Defendants ("Count VII"); a negligent misrepresentation claim against Defendants ("Count VIII"); an unfair competition claim against Defendants pursuant to § 480-2(a) ("Count IX"); a trespass claim against Defendants ("Count X"); and a nuisance claim against Defendants ("Count XI").

The Complaint prays for the following relief: general, special, treble, consequential, and punitive damages; reasonable attorneys' fees and costs; disgorgement of profits based on

---

[3] In addition to the two issues for which Plaintiffs demanded mediation, their breach of contract claim also alleges that Ohana breached their leases by failing to comply with the Soil Plan.  [Complaint at ¶ 184.c.]

unjust enrichment; prejudgment interest; and any other appropriate relief. [Id. at pg. 31.]

I. __Background Relevant to the Motion to Disqualify__

In the Motion to Disqualify, Defendants ask this Court to disqualify Lynch Hopper Smith LLP – which is now two separate law firms, Smith Law and Revere & Associates, LLLC (collectively "Smith/Revere") – from representing Plaintiffs "and all other current and former residents of military housing who have submitted mediation demands against Defendants since May 1, 2016." [Motion to Disqualify at 2.] Defendants assert that Smith/Revere "have unwaivable conflicts of interest and . . . violated [Haw. R. Prof'l Cond.] rules related to improper solicitation." [Id. at 3.] The Motion to Disqualify arises from an allegedly "defamatory social media campaign" against Defendants by Smith/Revere and Cara Barber, the lead plaintiff in Barber, et al. v. Ohana Military Communities, LLC, et al., CV 14-00217 HG-KSC, a putative class action that alleged claims which were virtually identical to the claims in the instant case.[4] [Mem. in Supp. of Motion to Disqualify at 1.] Defendants assert that the purpose of the campaign was to attract more current and former MCBH residents as clients for Smith/Revere. [Id.] In

---

[4] Ohana and Forest City were also the defendants in Barber. For the sake of clarity, in its discussion of Barber, this Court will refer to Ohana and Forest City as the "Barber Defendants."

addition – or in the alternative – to disqualification, Defendants seek appropriate sanctions.  [Motion to Disqualify at 2.]  Defendants bring the Motion to Disqualify pursuant to this Court's inherent powers and Section III of the Order Granting, in Part, Defendants' Motion for Preliminary Injunction, filed under seal in <u>Barber</u> on August 26, 2016 ("Barber Order").[5]  [<u>Id.</u> at 3.]

On July 19, 2015, while <u>Barber</u> was pending, Cara Barber posted a "Confidential MCBH Resident Survey" on her Facebook page titled "MCBH and Pearl Harbor Housing Issues" ("Survey").  [<u>Id.</u> at 9; Motion to Disqualify, Decl. of Randall C. Whattoff ("Whattoff Decl."), Exh. 7 (screen shot of Facebook page).]  Defendants argue that the questions were "highly biased," and the Survey did not contain any indication that: attorneys were involved in the drafting of the Survey; the responses would be shared with attorneys; or persons who responded to the Survey might be contacted in the future.  [Mem. in Supp. of Motion to Disqualify at 9; Whattoff Decl., Exh. 9 (Survey).]

<u>Barber</u> settled in February 2016.  [Mem. in Supp. of Motion to Disqualify at 9.]  Defendants assert that, soon thereafter, Cara Barber and Smith/Revere launched a campaign to

---

[5] The Barber Order related to the Barber Defendants' Motion for a Preliminary Injunction and Order to Show Cause Re: Violations of the Parties' Settlement Agreement on June 15, 2016 ("Barber Motion").  [<u>Barber</u>, dkt. nos. 278 (Barber Motion), 341 (Barber Order).]

recruit new clients to bring claims against Defendants.  The campaign involved Smith/Revere sending a letter to people who responded to the Survey and Cara Barber "launch[ing] an all-out smear campaign encouraging individuals to respond" to the letter. [Id. at 10.]  Smith/Revere issued a letter, dated May 9, 2016, regarding "Notice of Settlement & Potential Claim Deadline/Statute of Limitation" and the Barber case ("Solicitation Letter").[6]  [Whattoff Decl., Exh. 11 (Solicitation Letter).]  The Solicitation Letter states: "We are writing you because you previously contacted our office or our clients to request information about the class action lawsuit brought by our firm against [the Barber Defendants] related to pesticide contamination at" MCBH.  [Id. at 1.]  Defendants argue that this is a false statement because Smith/Revere sent the Solicitation Letter to people who responded to Cara Barber's Survey.  [Mem. in Supp. of Motion to Disqualify at 10; Whattoff Decl., Exh. 13 (Barber, 8/5/16 Hrg. Trans.) at 16-19.]  The Solicitation Letter stated: "We believe that military families living at MCBH from 2006 to at least 2014 have valid legal claims for return of their BAH" because of the failure to disclose the soil contamination.

---

[6] This Court acknowledges that Plaintiffs challenge the characterization of the letter as solicitation.  However, the Court will refer to the letter as the "Solicitation Letter" throughout the instant Order for the sake of simplicity.  This Court emphasizes that it makes no findings or conclusions at this time as to whether or not the letter constituted solicitation.

[Solicitation Letter at 2.]  It advised "you may need to act quickly to preserve any legal claims you wish to bring against Forest City related to pesticide contamination at MCBH."  [Id. at 1.]

Cara Barber's website had more than 1,5000 followers by early May 2016, and the number later grew to 1,800.  [Whattoff Decl., Exh. 13 (Barber, 8/5/16 Hrg. Trans.) at 38.]  She made frequent posts about "what she called 'some of the most hazardous chemicals known to man.'"  [Mem. in Supp. of Motion to Disqualify at 12 (quoting Whattoff Decl., Exh. 18 at 5).]  Cara Barber also communicated with followers through comments and private messages.  [Whattoff Decl., Exhs. 18-23.]  She encouraged the filing of new lawsuits against the Barber Defendants.  See, e.g., Whattoff Decl., Exh. 19 at 1-2, 5; Exh. 21 at 2-3.  In addition to her Facebook page, Cara Barber had a blog, a separate website, and an hour-long You Tube video about MCBH.  The video encouraged people to contact Smith/Revere.  [Mem. in Supp. of Motion to Disqualify at 12 (citing Whattoff Decl., Exhs. 24-25; id., Exh. 13 (Barber, 8/5/16 Hrg. Trans.) at 38-43).]

At the evidentiary hearing on the Barber Motion, Cara Barber testified that she did not coordinate her social media efforts with the Solicitation Letter; she claimed the timing was a coincidence.  [Whattoff Decl., Exh. 13 (Barber, 8/5/16 Hrg. Trans.) at 29-30, 42-43.]  Defendants argue that the

12

correspondence between Cara Barber and Smith/Revere proves they coordinated their efforts leading up to the Solicitation Letter. [Mem. in Supp. of Motion to Disqualify at 13-14 (citing Whattoff Decl., Exhs. 25-30).] Defendants also emphasize that Cara Barber stopped making entries on her public blog after the settlement agreement in January 2016, until she re-launched the blog six days before the Solicitation Letter went out. [Id. at 14 (citing Whattoff Decl., Exh. 24 at 49-55, 57-78).] Defendants point out that, two days after the Solicitation Letter went out, Cara Barber posted an annotated version of the letter on her blog and Facebook page.[7] [Id. at 14-15 (citing Whattoff Decl., Exh. 21 at 1-2; id., Exh. 24 at 45-47).] Cara Barber expressly encouraged followers to contact Smith/Revere in her posts and in her responses to followers' comments and questions. [Id. at 15 (citing Whattoff Decl., Exh. 11; id., Exh. 13 (Barber, 8/5/16 Hrg. Trans.) at 43; id., Exh. 20; id., Exh. 21 at 1-2; id., Exh. 24 at 45-47).] Defendants argue that the evidence shows that Cara Barber's social media campaign was coordinated with Smith/Revere's efforts. [Id. at 16.]

        Defendants assert that Cara Barber's social media campaign had false and misleading statements about MCBH.

---

[7] The version of the Solicitation Letter that Defendants submitted as Exhibit 11 appears to be Cara Barber's annotated version.

According to Defendants:

> Two of the most egregious claims are that
> (1) Defendants refused to remove 18 inches of
> contaminated top soil from MCBH because doing so
> was too expensive; and (2) the current soils at
> MCBH contain OCP levels that are 20 times higher
> than EPA safety recommendations.  The purpose of
> these claims was to spread false information and
> fear related to MCBH housing in an attempt to
> drive new clients to Smith/Revere.

[Id.]

As described by Defendants, the settlement agreement in

Barber ("Barber Agreement") "had a comprehensive confidentiality

provision that prohibited Ms. Barber and Smith/Revere from

publicizing the terms of the [Barber] Agreement."  [Mem. in Supp.

of Motion to Disqualify at 18.]  In the Barber Order, the

district judge concluded that the Barber Defendants established

that they were likely to succeed on the merits of their claim

that Cara Barber violated the confidentiality provision of the

Barber Agreement.  [Barber Order at 25-26, 29-30.]  In addition,

the district judge stated that, before the hearing on the order

to show cause regarding the alleged violations of the Barber

Agreement could go forward, a review of the possible violation of

Haw. R. Prof'l Cond. 1.7 was required.  The district judge

ultimately granted the Barber Motion in part and denied it in

part.  The district judge issued a preliminary injunction that

was to remain in effect until an adjudication on the merits of

the order to show cause, or until the district judge ordered

14

otherwise.  [Id. at 40-41.]  The portion of the Barber Motion
regarding the order to show cause remains pending because the
Barber Plaintiffs have appealed the Barber Order.  The district
judge has held all pending motions in abeyance in light of the
appeal.  [Barber, dkt. nos. 368 (Notice of Appeal), 381 (entering
order pending motions).]

   Defendants argue there is a current conflict of
interest between Plaintiffs and the other post-Barber claimants
on one side and Cara Barber and Smith/Revere on the other.
Defendants argue that, although Cara Barber made false
contentions in her social media campaign, Smith/Revere must take
the position that her statements were accurate and defend her
statements in the on-going litigation of the Barber Motion.
Smith/Revere must defend her statements because they are her
counsel and because they used her statements in their
solicitation efforts.  According to Defendants, "[t]his creates a
conflict of interest because it prevents Smith/Revere from
providing unbiased advice to Plaintiffs and other [post-Barber]
Claimants related to the risks of litigation."  [Mem. in Supp. of
Motion to Disqualify at 21.]  In addition, Defendants argue that
Smith/Revere violated Haw. R. Prof'l Cond. 8.4 because: Cara
Barber's social media campaign is attributable to Smith/Revere;
the campaign violated the confidentiality provision of the Barber
Agreement; and Cara Barber acted as a direct referral service for

Smith/Revere.   Similarly, Defendants argue that Smith/Revere's

use of false and misleading statements in the social media

campaign warrants disqualification by itself.   Finally,

Defendants argue that the Solicitation Letter and the Survey

violated Haw. R. Prof'l Cond. 7.1, and the Solicitation Letter

violated Haw. R. Prof'l Cond. 7.3.   Defendants assert that the

immediate disqualification of Smith/Revere is the only

appropriate remedy under the circumstances of this case.

## II.   Background Relevant to the Motion for Remand

Plaintiffs point out that their leases contain the

following provision:

> Choice of Law: For all Residents, this Lease and
> the contractual relationship between the parties
> shall be construed exclusively in accordance with,
> and shall be exclusively governed by the
> substantive laws of the State of Hawaii, including
> but not limited to Hawaii State Revised Statutes,
> chapter 521, and the common law interpreting those
> statutes.

[Mem. in Supp. of Motion for Remand at 2 (emphases omitted)

(quoting Ohana Military Communities Lease, ¶ 35).[8]]   Plaintiffs

argue that their relationship with Defendants "is exclusively

governed by the substantive law of the State of Hawaii."   [Id. at

3 (emphasis omitted).]

---

[8] An example lease is attached to the Motion for Remand as
Exhibit 1.   Plaintiffs have redacted the names of the residents,
but it was signed by one of the residents and someone from Forest
City on October 16, 2013.

Plaintiffs argue that the Notice of Removal:
1) incorrectly suggests that the mere fact that a claim arises from events that occurred on a federal enclave creates federal enclave jurisdiction; and 2) relies on <u>Federico v. Lincoln Military Housing</u>, 901 F. Supp. 2d 654 (E.D. Va. 2012), which was rejected by this district court in <u>Ching v. Aila</u>, Civ. No. 14-00253 JMS-RLP, 2014 WL 4216051 (D. Hawai`i Aug. 22, 2014). Plaintiffs urge this Court to follow the analysis in <u>Ching</u>. Further, they argue that this Court should not exercise federal question jurisdiction based on the fact that events at issue occurred on a federal enclave because "none of Plaintiffs [sic] claims necessarily depend upon resolution of a substantial question of federal law to justify usurping Hawaii's broad concurrent jurisdiction over MCBH."  [Mem. in Supp of Motion for Remand at 3.]

As to federal officer or agent removal, Plaintiffs argue that Defendants have not met the requirements of 28 U.S.C. § 1442(a)(1) because they have not established a sufficient causal nexus between their conduct under color of a federal office and Plaintiffs' claims.  Plaintiffs also argue that Defendants have not established a colorable defense because the derivative sovereign immunity defense that Defendants have invoked is not available to them for Plaintiffs' claims. Plaintiffs urge this Court to remand the case to the state court.

## DISCUSSION

I.   **Motion to Disqualify**

    A.   **Applicable Standards**

The Ninth Circuit has stated:

> Federal courts have inherent powers to manage their own proceedings and to control the conduct of those who appear before them.  Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991).  By invoking the inherent power to punish bad faith conduct which abuses the judicial process, a court must exercise discretion in fashioning an appropriate sanction. Id. at 44-45, 111 S. Ct. at 2132-33.

> District judges have an arsenal of sanctions they can impose for unethical behavior.  These sanctions include monetary sanctions, contempt, and the disqualification of counsel.  In Gas-A-Tron of Ariz. v. Union Oil Co., 534 F.2d 1322 (9th Cir.), cert. denied sub nom. Shell Oil Co. v. Gas-A-Tron of Ariz., 429 U.S. 861, 97 S. Ct. 164, 50 L. Ed. 2d 139 (1976), this court recognized that a district court has the primary responsibility for controlling the conduct of the attorneys who practice before it.  Id. at 1325 . . . .

Erickson v. Newmar Corp., 87 F.3d 298, 303 (9th Cir. 1996).  This

district court has stated:

> Motions to disqualify counsel are "subjected to particularly strict judicial scrutiny."  Optyl Eyewear Fashion Int'l Corp. v. Style Cos., 760 F.2d 1045, 1050 (9th Cir. 1985) (quotations omitted).  Disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary."  Schiessle v. Stephens, 717 F.2d 417, 420 (7th Cir. 1983).

> The party seeking disqualification "carries a heavy burden and must satisfy a high standard of

18

proof because of the potential for abuse." <u>In re Marvel</u>, 251 B.R. 869, 871 (N.D. Cal. 2000).  A motion for disqualification "should not be decided on the basis of general and conclusory allegations." <u>Chuck v. St. Paul Fire & Marine Ins. Co.</u>, 606 P.2d 1320, 1325 (Haw. 1980).  A court's factual findings for disqualification must be "supported by substantial evidence." <u>Visa U.S.A. v. First Data Corp.</u>, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003).

The Hawaii Rules of Professional Conduct govern Plaintiff's conflict of interest arguments . . . .[9]

<u>White v. Time Warner Cable</u>, Civ. No. 12-00406 JMS-BMK, 2013 WL 772848, at *1 (D. Hawai`i Feb. 27, 2013).

## B.   **Analysis**

As a threshold matter, Plaintiffs argue that Defendants lack standing to seek the disqualification of Smith/Revere based on the alleged conflict between counsel and Plaintiffs.  Even if this Court concludes that Defendants have standing, Plaintiffs argue that Defendants have not carried their heavy burden of proving that disqualification is necessary.

Plaintiffs emphasize that <u>Barber</u> was filed as a class action, although there was no final ruling on class

---

[9] Local Rule 83.3 states: "Every member of the bar of this court and any attorney permitted to practice in this court pursuant to LR83.1(d) or (e) shall be governed by and shall observe the standards of professional and ethical conduct required of members of the Hawaii State Bar."

certification.[10]   Before the settlement, "hundreds of military families had contacted either" Smith/Revere or the lead Barber Plaintiffs.  Of those, approximately 600 people gave contact information so that they could receive updates about Barber. [Disqualification Opp., Decl. of Patrick Kyle Smith ("Smith Disqualification Decl.") at ¶ 10.]  Plaintiffs state that the commencement of a class action suspends the statute of limitations for all members of the putative class until certification is denied.  At that point, the people that would have been part of the class must decide whether to file their own actions or to intervene as members of the attempted class action. Thus, when Barber settled without a final decision on the Barber F&R, the statutes of limitations on the putative class members' claims were no longer tolled.  Plaintiffs represent that Smith/Revere only contacted families who provided information prior to the Barber settlement, and they argue that Smith/Revere

---

[10] The Barber Plaintiffs filed their Renewed Motion for Class Certification of Non-UDAP Claims on August 14, 2015, and the magistrate judge issued his findings and recommendation to deny the motion ("Barber F&R") on November 20, 2015.  [Barber, dkt. nos. 211, 253.]  On December 4, 2015, the Barber Plaintiffs filed objections to the Barber F&R.  [Id., dkt. no. 258.]  The district judge never ruled on the objections to the Barber F&R because the case settled.  [Id., Minutes, filed 1/5/16 (dkt. no. 265) (noting that the settlement was placed on the record and the Barber F&R and the objections were terminated).]  Plaintiffs emphasize that the magistrate judge found that all of the Fed. R. Civ. P. 23(a) requirements were satisfied and that the superiority prong of Rule 23(b)(3) was satisfied. [Disqualification Opp. at 6-7.]

had an ethical obligation to inform those families about the
settlement.  According to Plaintiffs, what Defendants call the
"Solicitation Letter" was actually a notice to the potential
Barber class members informing them about how their rights may be
affected by the settlement.  The letter advised the potential
class members to contact **any** attorney to ensure that their rights
were protected, *i.e.* it did not urge them to contact Smith/Revere
in particular.

Plaintiffs acknowledge that the Solicitation Letter
states Smith/Revere believed the proposed class members' claims
for recovery of their BAH were viable, but they emphasize that
the letter did not mention any specific recovery amount.
Further, they assert that this assessment was accurate because
the Barber Plaintiffs prevailed on the motion to dismiss and the
motion for summary judgment.[11]  According to Plaintiffs, Cara
Barber testified during the hearing on the Barber Motion that she

---

[11] The Barber Defendants filed their Motion to Dismiss
Plaintiffs' Class Action Complaint for Damages on May 13, 2014,
and the district judge granted the motion in part and denied it
in part on July 15, 2014.  [Barber, dkt. nos. 8, 24.]  The Barber
Plaintiffs filed their First Amended Class Action Complaint for
Damages & Injunctive Relief on August 29, 2014.  [Id., dkt. no.
25.]  Pursuant to a stipulation and order filed on January 16,
2015, the Barber Plaintiffs filed their Second Amended Class
Action Complaint for Damages & Injunctive Relief on January 19,
2015.  [Id., dkt. nos. 73, 75.]  On June 1, 2015, the Barber
Defendants filed their Motion for Summary Judgment on All
Remaining Counts of the Second Amended Complaint.  The district
judge denied the motion on July 9, 2015.  [Id., dkt. nos. 109,
192.]

posted the "Solicitation Letter" on her own, because of the inquiries she was receiving, and that Smith/Revere never asked her to post anything on social media.

### 1.   Standing

In discussing the district courts' responsibility to control attorney conduct, the Ninth Circuit has stated:

> **Whenever an allegation is made that an attorney has violated his moral and ethical responsibility**, an important question of professional ethics is raised.  It is the duty of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar.  **The courts**, as well as the bar, **have a responsibility to maintain public confidence in the legal profession**.  This means that a court may disqualify an attorney for not only acting improperly but also for failing to avoid the appearance of impropriety.

Erickson, 87 F.3d at 303 (emphases added).  In light of this Court's duties to the members of the district court's bar and the general public, this Court concludes that it has an obligation to address the issues raised in the Motion to Disqualify even assuming that Defendants do not meet the traditional standing requirements.  This Court acknowledges that "a motion to disqualify is often tactically motivated, and can be disruptive to the litigation process." Certain Underwriters at Lloyd's London v. Argonaut Ins. Co., 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003).  However, the evidence Defendants have presented about purported attorney misconduct in support of the Motion to

Disqualify is very troubling, and there is no evidence that the Motion to Disqualify was brought for improper purposes.  This Court therefore REJECTS Plaintiffs' argument that this Court should not consider the merits of the Motion to Disqualify because Defendants lack standing.

### 2.  Merits

The parties have already submitted and/or relied upon extensive materials from Barber, including the Barber Motion and the Barber Order.  As previously stated, the Barber Order is on appeal, and there are motions pending in Barber – including portions of the Barber Motion – that have been held in abeyance in light of the appeal.  The vast majority of the issues currently before this Court in the Motion to Disqualify are squarely, and more directly, presented in Barber.  This Court therefore CONCLUDES that it cannot rule upon the merits of the issues in the Motion to Disqualify until there has been a final resolution of the corresponding issues in Barber.  The Motion to Disqualify is therefore DENIED.[12]  The denial is WITHOUT PREJUDICE to the filing of a new motion to disqualify based on either a final resolution of the corresponding issues in Barber

---

[12] In light of the grounds for this Court's denial of the Motion to Disqualify, Plaintiffs' request for an award of attorneys' fees and costs they incurred in responding to the Motion to Disqualify is DENIED, but also without prejudice and may be sough depending upon the outcome of Barber.

or changed circumstances in the instant case that are not

dependent upon the outstanding proceedings in Barber.

Although this Court has not made a ruling on the merits

regarding the alleged conflict, this Court recognizes that, if a

conflict exists, it may have an impact on the litigation of the

instant case.  However, the potential impact on of the conflict –

if one is proven to exist – is outweighed by the disruption to

the litigation process and the undue delay that would result if

this Court held this case in abeyance.  This Court therefore

declines to stay or otherwise limit the proceedings in the

instant case pending the resolution of the corresponding issues

in Barber.

## II.   **Motion for Remand**

### A.   **Judicial Notice**

On November 21, 2016, Defendants filed a request for

judicial notice in support of the Remand Opposition ("RJN").

[Dkt. no. 35.]  Defendants ask this Court to take judicial notice

of the following: excerpts from the docket sheet for Holliday, et

al. v. Extex, et al., CV 05-00194 DAE-LK; the complaints filed in

state court prior to removal to this district court in Butler, et

al. v. Ohana Military Communities, LLC, et al., CV 16-00626 JMS-

RLP, Dix, et al. v. Ohana Military Communities, LLC, et al.,

CV 16-00627 DKW-RLP, Ochoa, et al. v. Ohana Military Communities,

LLC, et al., CV 16-00629 KJM, and Manaea, et al v. Ohana Military

Communities, LLC, et al., CV 16-00628 HG-RLP; the Notice of

Removal and memoranda regarding the motion to remand filed in

Ching; and Cara Barber's response to Ohana's request for answers

to interrogatories in Barber.

A court "must take judicial notice if a party requests

it and the court is supplied with the necessary information."

Fed. R. Evid. 201(c)(2).  "The court may judicially notice a fact

that is not subject to reasonable dispute because it . . . can be

accurately and readily determined from sources whose accuracy

cannot reasonably be questioned."  Rule 201(b)(2).  "A court may

. . . 'properly take judicial notice of court records.'"  Fields

v. Nationstar Mortg. LLC, CIVIL No. 15-00015 LEK-KJM, 2016 WL

7840170, at *1 (D. Hawai`i Dec. 30, 2016) (some citations

omitted) (quoting Negrete v. Petsmart, Inc., No. 2:13-CV-01218-

MCE-AC, 2013 WL 4853995, at *1 (E.D. Cal. Sept. 10, 2013)),

report and recommendation adopted, 2017 WL 214178 (Jan. 18,

2017).  This Court therefore GRANTS Defendants' RJN.

B.   **Applicable Standards**

"Removal and subject matter jurisdiction statutes
are 'strictly construed,' and a 'defendant seeking
removal has the burden to establish that removal
is proper and any doubt is resolved against
removability.'"  Hawaii ex rel. Louie v. HSBC Bank
Nev., N.A., 761 F.3d 1027, 1034 (9th Cir. 2014)
(quoting Luther v. Countrywide Home Loans
Servicing LP, 533 F.3d 1031, 1034 (9th Cir.
2008)).  Thus, "'[i]t is to be presumed that a
cause lies outside [the] limited jurisdiction [of
the federal courts] and the burden of establishing

the contrary rests upon the party asserting jurisdiction.'" <u>Hunter v. Philip Morris USA</u>, 582 F.3d 1039, 1042 (9th Cir. 2009) (quoting <u>Abrego Abrego v. Dow Chem. Co.</u>, 443 F.3d 676, 684 (9th Cir. 2006)) (alterations in original).  This "'strong presumption against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper,' and that the court resolves all ambiguity in favor of remand to state court." <u>Id.</u> (quoting <u>Gaus v. Miles, Inc.</u>, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam)).

<u>U.S. Bank, Nat'l Ass'n v. Mizukami</u>, CIVIL NO. 15-00523 JMS-BMK, 2016 WL 632195, at *2 (D. Hawai`i Feb. 17, 2016) (alterations in <u>U.S. Bank</u>).

As a general rule, the existence of removal jurisdiction is determined at the time the removal petition is filed, irrespective of subsequent events.  <u>See, e.g.</u>, <u>Allen v. F.D.I.C.</u>, 710 F.3d 978, 984 (9th Cir. 2013).  The Ninth Circuit has stated:

> Challenges to the existence of removal jurisdiction should be resolved within th[e] same framework [as a motion to dismiss for lack of subject matter jurisdiction], given the parallel nature of the inquiry.  The statute governing removal of civil actions tracks the language of Rule 8(a)(1), requiring the defendant to provide "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a).  Like plaintiffs pleading subject-matter jurisdiction under Rule 8(a)(1), a defendant seeking to remove an action may not offer mere legal conclusions; it must allege the underlying facts supporting each of the requirements for removal jurisdiction. <u>Gaus v. Miles, Inc.</u>, 980 F.2d 564, 567 (9th Cir. 1992) (per curiam).  A plaintiff who contests the existence of removal jurisdiction may file a motion to remand, <u>see</u> 28 U.S.C. § 1447(c), the functional equivalent of a defendant's motion to

> dismiss for lack of subject-matter jurisdiction
> under Rule 12(b)(1).  As under Rule 12(b)(1), a
> plaintiff's motion to remand may raise either a
> facial attack or a factual attack on the
> defendant's jurisdictional allegations, triggering
> application of the rules discussed above for
> resolving such challenges.

Leite v. Crane Co., 749 F.3d 1117, 1122 (9th Cir. 2014).

### B.   Federal Enclave Jurisdiction

28 U.S.C. § 1331 states that: "The district courts

shall have original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States."

Further, in pertinent part, the Enclave Clause of the United

States Constitution gives Congress the power to "exercise

exclusive Legislation in all Cases whatsoever, over such District

(not exceeding ten Miles square) as may, by Cession of particular

States, and the Acceptance of Congress, become the Seat of the

Government of the United States."  U.S. Const. Art. 1, § 8,

cl. 17.

> However, as recognized by the Supreme Court, the
> Enclave Clause is not the sole authority for the
> acquisition of federal enclave jurisdiction and
> jurisdiction less than exclusive may be granted to
> the United States.  Collins v. Yosemite Park &
> Curry Co., 304 U.S. 518, 528 (1938) ("The States
> of the Union and the National Government may make
> mutually satisfactory arrangements as to
> jurisdiction of territory within their borders and
> thus in a most effective way, cooperatively adjust
> problems flowing from our dual system of
> government.  Jurisdiction obtained by consent or
> cession may be qualified by agreement or through
> offer and acceptance or ratification.  It is a
> matter of arrangement.  These arrangements the

> courts will recognize and respect."); <u>see also</u>
> <u>Kelly v. Lockheed Martin Servs. Grp.</u>, 25 F. Supp.
> 2d 1, 3 (D.P.R. 1998) (stating that federal
> enclave jurisdiction can be obtained when "the
> federal government reserves jurisdiction over
> portions of a state when the state enters the
> Union").

<u>Ching v. Aila</u>, Civil No. 14-00253 JMS-RLP, 2014 WL 4215880, at *3 (D. Hawai`i July 22, 2014).[13]  The State of Hawai`i and the federal government have concurrent jurisdiction over MCBH pursuant to the Admission Act.  <u>See, e.g.</u>, <u>Kalaka Nui v. Actus Lend Lease, LLC</u>, Civ. No. 08-00308 SOM/LEK, 2009 WL 1227892, at *5 (D. Hawai`i May 5, 2009) ("The Admission Act clearly provides that Hawaii has concurrent jurisdiction over such military bases so long as state jurisdiction is consistent with post-Admission Act laws enacted by the United States Congress.").

Defendants urge this Court to adopt the analysis in <u>Federico v. Lincoln Military Housing</u>, 901 F. Supp. 2d 654 (E.D. Va. 2012), which involved claims brought by a family that lived in military housing against private entities that allegedly owned, managed, and operated the housing under the MHPI.  The Federicos alleged that they suffered personal and property

---

[13] 2014 WL 4215880 is the magistrate judge's Findings and Recommendation to Deny Plaintiffs' Motion to Remand, which the district court rejected.  2014 WL 4216051 (Aug. 22, 2014). However, the quoted portion of 2014 WL 4215880 was part of the analysis supporting the magistrate judge's finding that the land at issue was a federal enclave.  The district court adopted that finding.  2014 WL 4216051, at *4-5.

injuries because they were exposed to "excessive moisture and mold conditions" in the military housing.  901 F. Supp. 2d at 656.  Like Plaintiffs in the instant case, the Federicos alleged breach of contract claims, negligence claims, and violations of Virginia landlord-tenant laws.  Id.  The Federicos filed their complaint in state court, the defendants removed the case, and the Federicos moved to remand.  Id. at 662.  The main issue presented in the motion for remand was whether there was subject matter jurisdiction because the Federicos' claims arose from events that occurred on a federal enclave.  Id. at 663.  The district court ultimately concluded that, "where concurrent jurisdiction over claims arising on a federal enclave exists, and matters involve substantial federal interests such that a federal question is presented, federal jurisdiction over the state law claims is proper."  Id. at 675.

In the instant case, Plaintiffs counter that this Court should adopt Ching, which rejected Federico.  In Ching, this district court stated:

> Federico rejected the traditional "substantial
> question of federal law" inquiry in determining
> subject matter jurisdiction, and instead held that
> "there should be a federal forum in which to
> litigate controversies arising on federal enclaves
> — even when there is concurrent jurisdiction, the
> complaint involves state law claims, and a state
> forum also exists — in order to prevent state
> judicial interference with 'matters likely to
> involve substantial federal interests."
> [Federico, 901 F. Supp. 2d] at 672 (citing Akin v.

29

> > Big Three Indus., Inc., 851 F. Supp. 819, 822
> > (E.D. Tex. 1994) (exercising federal enclave
> > jurisdiction over toxic tort case on Air Force
> > base)). . . .
>
> > The court rejects Federico because it fails
> > to follow the federal question inquiry and
> > impermissibly replaces it with a subjective
> > analysis of what may or may not be a "federal
> > interest." The test is not whether a case
> > implicates, in a generic sense, a particular
> > federal interest, but rather whether the
> > plaintiff's right to relief necessarily depends on
> > resolution of a substantial question of federal
> > law. Gunn [v. Minton], 133 S. Ct. [1059,] 1065
> > [(2013)]. Federico therefore finds no support in
> > federal question jurisdiction jurisprudence.

Ching, 2014 WL 4216051, at *8. Thus, the district court applied

the traditional analysis for determining whether "the removed

claims 'aris[e] under the Constitution, laws, or treaties of the

United States.'" Id. at *3 (alteration in Ching) (quoting 28

U.S.C. § 1331).

This Court acknowledges that the statement in Federico

regarding the prevention of state judicial interference where

there are substantial federal interests arguably could be

interpreted as adopting a rule that there is federal enclave

jurisdiction where a claim involves substantial federal

**interests**, even though there are no federal **questions**. However,

this Court respectfully disagrees with the interpretation of

Federico in Ching. As previously noted, the ultimate conclusion

in Federico was that there is concurrent federal jurisdiction

over state law claims arising on a federal enclave where the case

30

"involve[s] substantial federal interests **such that a federal question is presented**." See Federico 901 F. Supp. 2d at 675 (emphasis added). Federico does not eliminate the requirement that federal question be present.

Further, this Court does not interpret the controlling case law regarding federal enclave jurisdiction as requiring that the federal questions which must be present meet all of the requirements necessary to establish federal question jurisdiction. In other words, federal enclave jurisdiction does not necessarily require that the plaintiff's claims would trigger federal question jurisdiction even if the claims had not arisen from events which occurred on a federal enclave. Were that the case, the federal enclave doctrine would be unnecessary because the federal courts would have jurisdiction directly under § 1331 in every instance that the federal enclave doctrine applied. This Court therefore declines to follow Ching and adopts the ultimate conclusion in Federico.

In the instant case, Plaintiffs' state law claims, while not directly challenging public-private ventures ("PPVs") entered into pursuant to the MHPI, implicate issues regarding the federal government's responsibilities regarding PPVs. In Federico, the district court stated:

> [A]lthough both parties have addressed the fact
> that the Navy still owns the homes even after
> conveying them, it is important to note in this

context that Mid-Atlantic cannot sell these homes, and the homes, and all improvements, revert back to the Navy. There has been no deed actually giving title to the real estate to Mid-Atlantic. Mid-Atlantic has a limited grant from the Navy, and the homes and land are not taxable by the City of Norfolk as they belong to the federal government. . . .

901 F. Supp. 2d at 675. Similarly, in the instant case,

The purpose of the Ground Lease and Operating Agreement[14] was to allow Ohana, a PPV under the MHPI, to "lease, design, finance, demolish, develop, construct, renovate, own, manage, acquire, operate and maintain residential units and related improvements comprising the Project in support of Navy Operations located in the Navy Region Hawaii and in support of Marine Corps Operations located at the Marine Corps Base Hawaii[.]" Operating Agreement at § 2.03. Many of the acts that Plaintiffs complain of — including the alleged overcharging of rent — were performed by Defendants in accordance with the Ground Lease, Operating Agreement, and Property

---

[14] The Notice of Removal states:

Effective May 1, 2004, the following transactions occurred, among others: (1) [Hawaii Military Communities, LLC ("HMC")] and the Navy entered into a 50-year Initial Ground Lease; (2) HMC assigned its right, title, interest and obligations to and under the Initial Ground Lease to Ohana; (3) HMC and the Navy entered into an Initial Operating Agreement creating Ohana; and (4) Ohana and Forest City entered into an Original Property Management Agreement. Thereafter, the parties executed amended and restated ground leases, operating agreements, and property management agreements. The operative versions of these documents are hereinafter referred to as the "Ground Lease," the "Operating Agreement," and the "Property Management Agreement."

[Notice of Removal at ¶ 18.]

Management Agreement. . . .

[Notice of Removal at ¶ 33.]  As with the mold in the Navy
housing at issue in Federico, the soil contamination at the MCBH
housing in the instant case implicates the Navy's reversionary
interest in the housing currently operated by Defendants.  This
is illustrated by the fact the Soil Plan requires that detailed
maps of MCBH sites where soil contamination was found be made
available to, inter alia, the Navy.  Plaintiffs appear to
question Defendants' compliance with those requirements because
they state that such maps were not provided until Plaintiffs
brought complaints.  [Complaint at ¶¶ 173.d, 176.c.]  Further,
Plaintiffs' claims may implicate the Navy's potential liability
related to the original discovery of the soil contamination.  See
id. at ¶ 166 ("Before taking control of MCBH housing, Defendants
were warned by Metcalf Construction, which was **the contractor
originally hired by the Department of the Navy** to carry out
demolition and construction of military housing at MCBH, that
MCBH soils had been found that were contaminated with
pesticides." (emphasis added, other emphasis omitted)).  Finally,
Plaintiffs' claimed damages are based on the overpayment of rent
for the allegedly sub-standard housing they actually received.
The BAH and the standard of housing that it is intended to pay
for will be a significant component of Plaintiffs' damages, and

this implicates federal interests because Defendants assert that the Navy controls the amount of the BAH.

This Court therefore CONCLUDES that: Plaintiffs' state law claims involve substantial federal interests, such that the claims present federal questions; and there is federal enclave jurisdiction over Plaintiffs' state law claims in this case. This Court DENIES Plaintiffs' Motion for Remand.

**B.    Federal Officer or Agent Removal**

In light of its ruling that it has federal enclave jurisdiction over the instant case, this Court does not need to reach the issue of whether Defendants properly removed this case pursuant to 28 U.S.C. § 1442(a)(1).

**CONCLUSION**

On the basis of the foregoing, Defendants' Motion to Disqualify Counsel and/or for Sanctions, filed October 28, 2016, is HEREBY DENIED WITHOUT PREJUDICE, and Plaintiffs' Motion for Remand, filed November 10, 2016, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 15, 2017.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

KENNETH LAKE, ET AL. VS. OHANA MILITARY COMMUNITIES, LLC, ET AL; CIVIL 16-00555 LEK-KJM; ORDER DENYING DEFENDANTS' MOTION TO DISQUALIFY COUNSEL AND/OR FOR SANCTIONS AND DENYING PLAINTIFFS' MOTION FOR REMAND