| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF HAWAII |
| 3 | |

| | | |
|---|---|---|
| 4 | Plaintiffs Kenneth Lake, Crystal Lake, Harold Bean, Melinda Bean, Kyle Pahona, Estel Pahona, Timothy Moseley, and Ashley Moseley, for themselves and on behalf of all others similarly situated, | ) CV 16-00555LEK-KJM ) ) ) Honolulu, Hawaii ) May 22, 2017 ) |
| 7 | Plaintiffs, | ) MOTION TO DISMISS ) (8-1) 10/20/2016 ) |
| 8 | vs. | ) ) |
| 9 | Ohana Military Communities, LLC, Forest City Residential Management, Inc., and DOE Defendants 1-10, | ) ) ) ) |
| 11 | Defendants. | ) ) |
| 12 | | ) |

```
13                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LESLIE E. KOBAYASHI
14                UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16   For the Plaintiffs:      PATRICK KYLE SMITH
                              Smith Law
17                            970 N. Kalaheo, Suite A301
                              Kailua, Hawaii 96734
18
     For the Defendants:      RANDALL C. WHATTOFF
19                            KAMALA S. HAAKE
                              Cox Fricke LLP
20                            800 Bethel Street, Suite 600
                              Honolulu, Hawaii 96813
21
     Official Court Reporter: Debra Read, CSR CRR RMR RDR
22                            United States District Court
                              300 Ala Moana Boulevard
23                            Honolulu, Hawaii 96850
                              readit3949@gmail.com
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

```
 1    MONDAY, MAY 22, 2017                        9:48 A.M.

 2         THE COURTROOM MANAGER:  Civil 16-00555LEK-KJM,

 3    Kenneth Lake, et al. versus Ohana Military Communities LLC, et

 4    al.

 5         This case has been called for a hearing on a motion to

 6    dismiss.

 7         Counsel, please make your appearances for the record.

 8    Please speak into a microphone.

 9         MR. SMITH:  Good morning, Your Honor.

10         Kyle Smith on behalf of the plaintiffs Kenneth Lake, et

11    al.

12         THE COURT:  Good morning, Mr. Smith.

13         MR. WHATTOFF:  Good morning, Your Honor.

14         Randy Whatoff and Kamala Haake on behalf of the

15    defendants.

16         THE COURT:  Good morning to both of you.

17         First let me address the request for judicial notice.  So

18    I reviewed it.  I find that it's appropriate for me to take

19    judicial notice of what's been requested, so I will do so.  I

20    know that you had asked, Mr. Smith, in your response, but it

21    wasn't -- it's a response, and then within the response you

22    asked for a request for me to take judicial notice of certain

23    things, so I'm going to decline to do so because I don't think

24    it's a separate request.

25         However, of course I looked at Judge Gillmor's orders and
```

1   I'm actually going to ask you some questions with regard to

2   that, with regard to the motion as in why should I rule

3   differently.

4       But, so, you know, in a sense, I am taking judicial notice

5   because I've, obviously, read it and considered, you know, even

6   had a colleague go on very similar if not the same matters.

7   All right?

8       So let's turn to the motion to dismiss.  And I'm happy to

9   hear your argument, which you really know the case better than

10  I do.  But as I said, I do have Judge Gillmor's decisions.  I'm

11  not bound by them, but certainly I find a colleague's reasoning

12  to be, you know, quite persuasive.

13      So in essence, really, I want to know why you think I

14  should rule differently from her.  Clearly UDAP, I don't know

15  if you need to spend that much time, Mr. Whatoff.  I must say,

16  a couple areas where I may feel differently with regard to that

17  is the negligent infliction of emotional distress.

18      So I think typically what happens with NIED and IIED --

19  with the intentional infliction of emotional distress, that's

20  often a question of fact, so that's going to go forward, I

21  mean, on the summary judgment level.

22      With negligent infliction, you will, obviously, have to

23  show more than just a general allegation, right, that you've

24  been upset by someone.  I recognize that we're at the motion to

25  dismiss stage; however, in light of the fact that there's been

1    a lot of water under the bridge in the case, perhaps you can

2    address the negligent infliction of emotional distress and that

3    prong of the elements with regard to that.

4         The other area where I think I might differ is on the

5    breach of contract.  But I just give that as a outline and I'm

6    happy to hear your arguments.

7         All right.  Please use the microphone.  You're welcome to

8    use the podium or counsel table, but as long as you use the

9    microphone.

10        MR. WHATTOFF:  Thank you, Your Honor.

11        Let me start by explaining why this case is different on

12   the general failure to plead exposure to organochloride

13   pesticides.

14        Your Honor, this is no longer a class action complaint.

15   It's a complaint that is being asserted by individuals without

16   pleading requirements under *Twombly* and *Iqbal*.  These are the

17   claims that are being asserted in these claims, Your Honor:

18        Count 1 is for alleged breach of a lease requiring that

19   the specific home that the resident lived in by these

20   plaintiffs be safe and inhabitable;

21        Counts 2 and 3 are for breach of implied warranty with

22   regard to that specific home that the plaintiff lived in;

23        Count 4 for unfair and deceptive acts and practices.

24   That's for allegedly telling these plaintiffs that it is safe

25   for them to work and play in their yards when it was not safe

1   for them to allegedly work and play in their yards;

2       Count 5 for negligent failure to warn alleges that Ohana

3   failed to warn these plaintiffs that they, quote,

4   "Intentionally and knowingly exposed plaintiffs and their

5   families to increased risks of cancer and other adverse health

6   outcomes";

7       Count 6, 7, and 8 for intentional infliction of emotional

8   distress, fraud, and negligent misrepresentation.

9       All assert the same misconduct.  Every single one of those

10  claims requires these specific plaintiffs to plead that their

11  homes were impacted by unsafe levels of organochloride

12  pesticides.

13      For instance, if the home that the Lakes lived in in the

14  Mololani neighborhood was not impacted by unsafe levels of

15  organochloride pesticides, then Ohana could not breach that

16  lease with respect to that home because that home would be safe

17  and habitable.  If a different home in a different neighborhood

18  at a different time period had high levels of OCPs, that's not

19  a breach of the Lake's lease.

20      Nor could Ohana have breached the implied warranty of

21  habitability with the Lakes if there was no high levels of

22  organochloride pesticides around their home.  Nor would any of

23  the Lakes' tort claims work because the Lakes would not have

24  been exposed to excess cancer risks.

25      That's why class certification was denied, Your Honor, and

1    that fundamental failure requires the dismissal of the first

2    nine counts of the complaint.

3         Plaintiffs make two responses to this.  First, they direct

4    the Court to the Pesticides Soil Management Plan, and I want to

5    emphasize initially just how strange that is, that instead of

6    just going ahead and pleading that these folks were exposed to

7    the OCPs, they don't do this.  They cite this outside document

8    outside of the complaint.

9         What is the reason for that, Your Honor?  The reason is

10   that plaintiffs can't plead that their homes actually had

11   organochloride pesticides and they are trying to distract the

12   Court with this document.

13        Plaintiffs say, Look, when the plan was drafted, Ohana

14   stated that Ohana would assume that all the homes it was

15   redeveloping were impacted by these pesticides; therefore,

16   plaintiffs should be able to assume that all of the homes at

17   Marine Corps Base Hawaii was impacted by the pesticides.

18   That's the plaintiffs' argument.

19        But the assumption for the plan was for the purposes of

20   redevelopment.  The plan makes clear that when Ohana went out

21   and tested these neighborhoods when it first took over managing

22   the homes, it found some homes that had no pesticides

23   whatsoever, had some homes that were below Tier 1 which HDOH

24   says is safe for all purposes; other homes did have Tier 2

25   exceedances, but that didn't meet -- so it's not true that all

1     the homes had these exceedances.

2          What's more, the plan merely describes conditions in

3     certain neighborhoods when it was drafted in 2006.  After it

4     was drafted, and before service members like the Lakes moved

5     in, all of the soils from around these homes were removed and

6     replaced or were covered with new clean soils.

7          Plaintiffs' response to that is to say, "Well, that's just

8     what the attorneys are telling you, Your Honor.  You shouldn't

9     take that at face value."  But if that's the case, Your Honor,

10    then why aren't plaintiffs pleading that these pesticides were

11    around their homes?  They cannot because they don't have any

12    evidence to support that assertion.

13         The other argument plaintiffs make is that they say that

14    whether they were exposed to OCPs at their home is not relevant

15    because service members and their families did not confine

16    their activities to their specific homes.  They went for walks,

17    they visited other families, they did other activities that

18    would have exposed them to pesticides on the base.

19         There's a number of problems with that argument, Your

20    Honor.  First, it's not pled in the complaint.

21         Second, it doesn't fit with the actual causes of action

22    that are alleged in the complaint.  It's not a breach of that

23    specific lease if you're exposed to pesticides at another home.

24         Third, that theory of liability would create unprecedented

25    exposure to residents of Oahu.

1        These pesticides are ubiquitous on the island, Your Honor.

2    If your home was built before the 1980s and it's still standing

3    today, it was because it was treated with these organochloride

4    pesticides.  It was the only treatment for decades.  So the

5    idea that liability exposure might attach because someone

6    visited a home that happened to have these pesticides would be

7    a tsunami of liability for the people of Oahu.

8        More importantly, there has never been any showing and

9    plaintiffs have never pled that that sort of exposure has any

10   adverse health impact.

11       So to conclude on this argument that plaintiffs' failure

12   to plead these issues requires a dismissal of Counts 1 through

13   9, we're not trying to hold plaintiffs to some unreasonable

14   standard, Your Honor.  We're not saying that they need to plead

15   the exact percentage around each home.  But under the legal

16   theories that they're asserting, plaintiffs do need to plead

17   that their homes had unsafe levels of OCPs.  They can't do this

18   because the homes they lived in were either fully addressed

19   before they moved in or never treated with OCPs in the first

20   place.

21       Now, like I sort of alluded to, I think that the reason

22   that Judge Gillmor found differently on that issue, Your Honor,

23   is 'cause Judge Gillmor wanted to see if those issues could be

24   addressed on a class-wide level.  And what Judge Gillmor said

25   is it's those -- precisely those differences in the individuals

1   that defeat class certification in this case.

2      And if plaintiffs could plead these issues, what -- you

3   know, maybe some of them could, maybe some of them couldn't.

4   We don't believe that these theories would be viable in any

5   event, but it might get them over the pleadings in some of

6   these, if they could do that.  They might, but they haven't and

7   they can't because these plaintiffs haven't experienced those

8   issues.

9      THE COURT:  So when you say they haven't experienced

10  these issues, are they too late to have them have leave to file

11  an amended complaint?

12      MR. WHATTOFF:  Your Honor, we wouldn't -- I don't

13  think it's possible for them to fix the complaint because I

14  think it would violate Rule 11 for them to plead that they were

15  exposed.  I recognize that the Court would be likely to grant

16  leave to amend the complaint in this situation and we wouldn't

17  strongly oppose that here, but we do think that it would not

18  serve any purpose here, frankly.

19      Your Honor, I'll be brief on the UDAP claim.  Nothing has

20  changed since Judge Gillmor decided this issue.  Three ICA

21  decisions are directly on point that the services prong does

22  not apply to leases.  This is not something that hasn't been

23  addressed by the Hawaii state courts.  It's been fully

24  addressed.  The Supreme Court has denied cert on the issue, so

25  we think that that's a very clear-cut issue.

 1        If Your Honor has any questions, I'd be happy to answer

 2   them.

 3              THE COURT:  I don't.  Yeah.

 4              MR. WHATTOFF:  All right.  Well, if I may, Your

 5   Honor, I'd like to briefly go through some of the individual

 6   claims, including the intentional infliction of emotional

 7   distress and negligent infliction and point out some of the

 8   issues.  I'll try to be brief with it, Your Honor, plus please

 9   jump in if you have any questions.

10        Your Honor, on the first count for breach of contract,

11   plaintiffs have three alleged breaches.  First, they have the

12   safe and habitable housing allegation which I believe they've

13   already addressed.  They also claim it was a breach of the

14   lease to fail to make certain disclosures and to fail to fully

15   implement the Pesticide Soil Management Plan.

16        The problem with that argument is there's nothing in the

17   lease that requires either of those obligations, and plaintiffs

18   have not pled anything in the lease that would require those

19   obligations.  So that's a fundamental failure of pleading on

20   that first count, Your Honor.  It's black-letter law that if

21   you're going to plead a breach of contract, you got to plead

22   the contract provision that you contend was allegedly breached.

23        Those allegations, they might satisfy some other claim,

24   some tort claim or nondisclosure, but they were certainly not

25   breaches of contract, Your Honor.

1       Your Honor, Count 3 is for violation of Chapter 521.  That

2  is a claim that was not dismissed by Judge Gillmor.  I don't,

3  frankly, understand that claim, Your Honor.  There's two

4  provisions that have been identified in the complaint:

5  HRS 521-10 and 521-42(a)(1).  Neither of those provisions

6  contain any independent obligations.  They merely identify

7  different standards that apply to landlords.

8       Now, in plaintiffs' opposition they say -- I think what

9  they're saying is, Actually we meant to plead 521-42(a)(3),

10  which is the implied warranty of inhabitability, the

11  codification of that, and if that's the case, Your Honor, then

12  this claim is just duplicative of the second claim.  So I

13  believe that this count should be dismissed so that we can get

14  our hands around this complaint and address it properly.  As

15  it's currently pled, it's totally unclear what the alleged

16  violation is.  There's no specific breach of any statute that's

17  been identified.

18       Your Honor, before I get to IIED and NIED, let me just

19  briefly address Count 5 for negligent failure to warn, Count 10

20  for nuisance, and Count 11 for trespass.  Each of those claims

21  assert the plaintiff was exposed to construction dust.  But the

22  complaint does not provide any information at all about the

23  nature of this exposure.  There's no information about when

24  plaintiffs were allegedly exposed, the duration of any impact,

25  the extent of any impact.  That is all information that is

1    uniquely within plaintiffs' purview.

2       The failure to give that information violates under

3    *Twombly* and *Iqbal*, and there is no mere formality, Your Honor.

4    Some of the plaintiffs in this case had lived in neighborhoods

5    where no construction ever took place; other plaintiffs moved

6    into their homes after construction around them was completed.

7    So this is a very much in dispute issue and plaintiffs need to

8    identify when, where, how the alleged dust impact occurred so

9    that we can investigate it and see whether there's any validity

10   to those claims.

11      Your Honor, Count 6 for intentional infliction of

12   emotional distress, that's a unique tort with an exceedingly

13   high-level standard of misconduct, and I would respectfully

14   disagree with Your Honor that it can't be decided on a motion

15   to dismiss.  I think the *Ross v. Stouffer Hotel* case is

16   directly on point.  It said that this issue could be decided as

17   a matter of law.  And that case also said that there must be

18   outrageous conduct that, quote, "Goes beyond all bounds of

19   decency and to be regarded as atrocious, and utterly

20   intolerable in a civilized community."

21      Now, I think we can look at the complaint as it's pleaded

22   and those pleadings don't meet that standard, Your Honor.  As

23   pled in the complaint, defendants took over housing in 2006.

24   They did extensive testing.  They put together a Pesticide Soil

25   Management Plan.  That Soil Management Plan was submitted to

1     the Department of Health and approved by the Department of

2     Health.   Whether plaintiffs now disagree with that plan, that's

3     not the type of conduct that is atrocious and utterly

4     intolerable in a civilized community, and I would assert, Your

5     Honor, that that's as a matter of law.

6            THE COURT:   But I guess I'm looking at the language

7     here related to the nonmoving party, though.   They're saying

8     that as a result of this, your clients had actual knowledge

9     about pesticide levels and failed to disclose that, and that

10    is, you know, appalling, outrageous, etc., as our Hawaii

11    Supreme Court has defined it.

12           MR. WHATTOFF:   That's a good point, Your Honor.   I

13    think that shows -- that reflects back to the fundamental

14    pleading problem we have here, and that's that these

15    individuals were ever actually exposed to these organochloride

16    pesticides.

17           Agree, Your Honor, that if plaintiffs had pled that their

18    homes had these improper levels of OCPs and we had failed to

19    warn them about that, well, then, yes, maybe that gets them

20    over the hump on that standard.   But they haven't pled that,

21    Your Honor.

22           They've pled that these situations existed in certain

23    neighborhoods around certain homes in 2006.   After that, Ohana

24    did a ton of work to address the neighborhoods that are covered

25    by the Pesticide Soil Management Plan.   Plaintiffs lived in

1  these homes after that work occurred in many instances or were

2  in different neighborhoods in many instances.  So plaintiffs

3  have not and cannot plead that they were exposed to these

4  pesticides.

5       But I think that's the fundamental problem, Your Honor.

6  If that had been pled, then potentially this could be

7  addressed, but because it hasn't been pled, the standard can't

8  be met.

9            THE COURT:  Okay.  So you're saying that they have

10  to plead that they were actually exposed to these pesticides as

11  opposed to that information wasn't disclosed to them before

12  they decided whether or not to enter into the landlord-tenant

13  relationship?

14            MR. WHATTOFF:  That's right, Your Honor.  That

15  assumes -- the duty to disclose assumes that there were still

16  pesticides present at these homes.  It also assumes that these

17  levels of pesticides could ever cause any health effects, but

18  it assumes that -- you only have a duty to disclose if there's

19  pesticides found in the homes.  Because they haven't alleged

20  that the home that they leased, the home that they lived at had

21  these pesticides, there's nothing to disclose.  There's no duty

22  that could have been breached.

23            THE COURT:  Okay.  So you're saying that if they had

24  knowledge that in the general area but not in that specific

25  housing that there were at one point certain levels of

1   pesticides for which they basically came up with a remediation

2   plan, that they had no duty to disclose that information?

3              MR. WHATTOFF:  I think that's what I'm saying, Your

4   Honor.

5              THE COURT:  Okay.

6              MR. WHATTOFF:  If that remediation plan was

7   implemented, then there would be no duty to disclose because

8   the alleged negative health impacts would have been fully

9   addressed.  And that's the elephant in the room that plaintiffs

10  haven't addressed.  They've said, Look, back in 2006 there were

11  all these issues.  They haven't said that there were issues

12  while they lived there.

13             THE COURT:  But -- but looking at the light most

14  favorable to them, aren't they saying back in 2006 there were

15  all these problems and you came up with a remediation plan, and

16  you need to disclose that to people before they can be

17  knowledgeable about whether or not they want to move into that

18  housing?

19             MR. WHATTOFF:  Well, Your Honor, I don't think

20  that's what they're pleading.  If that's what they're pleading,

21  then I believe they should assert that in their complaint and

22  we would address it.

23             But for this specific claim, if that's what they're

24  pleading, then that's -- I think that certainly doesn't rise to

25  the level of atrocious and utterly intolerable conduct because

1    what they would be pleading is there was an issue; it was

2    addressed per Hawaii Department of Health; and you didn't

3    disclose that there was an issue that was addressed.  And under

4    those circumstances, I don't think that that meets the

5    standard, Your Honor.

6              THE COURT:  Okay.

7              MR. WHATTOFF:  Your Honor, I think I agree with you

8    on negligent infliction of emotional distress.  That is a claim

9    that you must have some sort of physical damage to plead.  That

10   hasn't been pled here.

11       There's two other groups of claims I wanted to address

12   quickly, Your Honor, Count 7 and 8 for fraudulent negligent

13   misrepresentation.  It's black-letter law that those claims

14   require reliance.  This shouldn't be a hard thing to plead.

15   Plaintiffs have to plead that they relied on the alleged

16   nondisclosure, and that they would have acted differently if

17   they had been provided that disclosure.  It's a simple thing to

18   do if they can plead it.

19       I don't think they can because there was no reliance.

20   One of these plaintiffs continues to live on base even after

21   the filing of the complaint.  So that's a basic requirement of

22   those claims that they need to plead.

23       Finally, Your Honor, Count 9 for unfair methods of

24   competition, as Your Honor may have noticed, that was addressed

25   by Judge Barber[*sic*], but in a sort of roundabout way --

1           THE COURT:  Judge Gillmor you mean.

2           MR. WHATTOFF:  I'm sorry.  Thank you -- sort of a

3    roundabout way in they thought had to amend and it was

4    dismissed.  This problem with unfair methods of competition

5    claim is if it's got to be related to the anti-competitive

6    petition.  You've got to allege the nature of the competition.

7        Your Honor, I was going to address the statute of

8    limitations thing, if you have any questions, okay?

9           THE COURT:  I don't.  Did you want to talk about

10   nuisance and trespass?  I don't think this is trespass.  I see

11   what they're saying about nuisance, but --

12          MR. WHATTOFF:  Well, again, I would just say that it

13   wasn't pled.

14          THE COURT:  Right.

15          MR. WHATTOFF:  Your Honor, that if these folks say

16   that they were exposed to dust, tell us when, tell us what time

17   period, tell us what the impact was, because there are these

18   different time periods when construction was going on, when it

19   wasn't going on.  If you don't plead that, and that's

20   information that is totally within the kuleana of the

21   plaintiffs, we can't address it, Your Honor.  Doesn't put us on

22   notice of the alleged misconduct.

23       In summary, Your Honor, we recognize that this is a

24   lengthy motion and I appreciate you giving us so much time to

25   address these issues.  The reason this motion is lengthy is

1   because there's numerous problems with plaintiffs' complaint.

2   All that occurred here was plaintiffs' names were added to the

3   caption of a class action complaint.  That complaint was

4   significantly defective to begin with, but more importantly, it

5   contains none of the facts that would be necessary to assert

6   individual claims on behalf of these plaintiffs.  For that

7   reason, the complaint should be dismissed.

8        Thank you, Your Honor.

9        THE COURT:  All right.

10       MR. SMITH:  Good morning, Your Honor.

11       THE COURT:  Good morning, Mr. Smith.

12       MR. SMITH:  I'll try to be equally brief.  I'd like

13   to start on that last point which is sort of the pleadings,

14   sort of the attack, this is pled essentially the same as the

15   class complaint and that there are significant -- I'm not sure

16   the phraseology -- but significant problems with the class

17   action complaint.

18       The reality is it should be expected that they are nigh

19   identical.  And the reason is because we amended that complaint

20   per leave of the Court.  That complaint was accepted.  And then

21   we went through a lot of different -- there was a summary

22   judgment challenge to that complaint that we needed expert

23   testimony on a lot of these same issues.  The complaint

24   survived.  We told them when it was pled a class that there

25   were going to be follow-up complaints on behalf of the

1    individuals, and so we did use the same complaint.

2         By the way, I apologize for the numbering.  What happened

3    was we had the initial mediation for the initial group of

4    filings and it got printed literally at DPR, and it changed up

5    the numbering.  So we already have an agreement -- I mentioned

6    in there -- to change that.  We left it the way it is because

7    we didn't want to screw up the record for today, obviously.

8              THE COURT:  Yeah.

9              MR. SMITH:  So the idea that this complaint is very

10   similar, I mean, of course it is because the claims are very

11   similar.  We've gone through a lot of background.

12        That being said, if the Court feels that we need to amend

13   to add additional factual content, we can, particularly in the

14   issues of dust and time and frame.  You know, you and I are not

15   new to a dust case and in the other one, for example, I didn't

16   have that either.  The background really was then for

17   individual people was sorted out in discovery which is exactly

18   what we did in *Barber* where each, you know, through the

19   thoroughness of the discovery, it was laid out without, you

20   know, a complaint that might be, you know, many, many, many

21   pages longer if you included all of that underlying detail.

22        These people clearly did live at Marine Corps Base Hawaii.

23   I think that takes us into the next point which is this context

24   of -- some of your questions were devoted to it -- all these

25   claims survive regardless of some quantum of exposure.  And to

 1   understand why -- because we are jumping in sort of later in

 2   the stream -- we haven't had a lot of the more in-depth factual

 3   arguments that we had in front of Judge Gillmor at the motion

 4   to dismiss stage.

 5        Let me explain why.  It's important to understand it's

 6   tied to the negligent infliction claim, the intentional

 7   infliction claims, and others.

 8        What happened is the military can essentially do what it

 9   wants when it's changing over housing, using pesticides, etc.

10   But then when it turned to a private contractor, private

11   company that takes over and tells them about this contamination

12   level, what they go out and do is they do thousands of soil

13   tests throughout the base.  They then test a subset of those

14   tests and they come to the conclusion that these neighborhoods

15   that they're taking over are so contaminated, we're not going

16   to do additional testing.  We're going to assume it's in all of

17   the neighborhoods where there's been no testing.

18        And so rather than going house by house by house by house

19   and say clean, dirty, clean, dirty, they just assume it's all

20   dirty.

21        Now, this is where one of the key issues in the case.  At

22   that point they didn't stop and say, "We are assuming it's all

23   dirty; therefore, we're not going to lease those homes.  We're

24   going to fix them according to our plan, carry out the fix,

25   make sure it's fixed, and then we will lease."

1    Instead, they carried out essentially a staggered

2    construction leasing project.  So they have, you know, cash

3    flow from 2006 to 2014, and they are leasing homes in

4    neighborhoods here -- or I hate to even call them neighborhood

5    'cause the neighborhood's Marine Corps Base Hawaii.  They don't

6    even notice these different little delineations on the map.

7    When you PCS in as a military family, you're going to Marine

8    Corps Base Hawaii and it's sold as a community, as a gated

9    community, and that's why the pleadings read the way they do.

10    So you purchase a lease into this community.  And Ohana,

11    because of the levels and the exceedances, actually carried out

12    an exposure assessment for living there.  And they said, Well,

13    yes, it's over HDOH's Tier 1 level.  We're going to create an

14    acceptable level called a Tier 2.  I'm giving this background

15    just so we're on the same term, sort of the factual --

16    That Tier 2 level essentially allows you to live or them

17    to say that we're going to do something based upon the use of

18    the site and that's allowed to do that.  And that Tier 2 level

19    that they decided was based upon a 6-year exposure assumption

20    for a military family.  So they say, Military family, you're

21    going to come to our base housing.  You're only going to be

22    here six years because that's two three-year terms or two

23    three-year tours for your family, and we're going to allow you

24    to be exposed to this level.  And that's okay 'cause you're

25    only going to be here six years.  Even if that changes -- and

1    this is another key part -- it changed the risk exposure from a

2    one-in-a-million chance of cancer and other adverse

3    consequences down to a one-in-a-hundred-thousand chance for

4    that.  So essentially there is a risk ascension on behalf of

5    military families on the lease.

6         Now in my mind, that's outrageous for a landlord to do

7    that, if you don't tell a tenant that we've decided and found

8    out that it is contaminated, this base, widespread

9    contamination.  We've carried out a risk assessment on your

10   behalf and we're not going to tell you about it, but we think

11   you're okay so long as you only live here for six years.

12        Now mind you, some families live there longer than

13   six years as well.  Some families don't live there for

14   six years.  The issue that underlies the breach of contract,

15   you know, the IIED and all of this, the real core is that

16   decision making and secret on behalf of these families

17   that live in --

18        THE COURT:  So their failure to warn.

19        MR. SMITH:  Absolutely.  At its crux, that's the key

20   issue for breach of contract.

21        Now, let's talk about that breach of contract.  Remember,

22   the Pesticide Soil Management Plan is part of the lease, it's

23   part of the contract, and when we start talking about no duty

24   to disclose this, well, that's crazy.  And in part -- and we

25   cited this in our brief -- once you start telling people just a

1    little bit of the truth, that these pesticides might be in the

2    United States, well, that creates an obligation to tell them

3    the full story, and they didn't.

4           THE COURT:  Okay.  When you say it's part of the

5    lease, how is it part of the lease?

6           MR. SMITH:  Yes.  It's specifically incorporated as

7    an exhibit and incorporated into the lease itself, these

8    representations.  And it's -- the Pesticide Soil Management --

9    or pardon me; I just screwed up my terminology -- the Community

10   Handbook is incorporated into the lease where it says this

11   might be used or may be found in the United States, without a

12   disclosure that it's specifically found --

13          THE COURT:  But the soil part wasn't --

14          MR. SMITH:  It was not.  I apologize.

15          THE COURT:  I thought I missed something in reading.

16   Okay.  Okay.

17          MR. SMITH:  I -- you know --

18          THE COURT:  Thank you.  No, no, no.  Go ahead.

19   Good.  This is why --

20          MR. SMITH:  The Community Handbook -- thank you,

21   Judge -- the Community Handbook.  And that's where it has these

22   essentially misleading assertions of pesticide contamination.

23   And mind you, the Community Handbook is not a Community

24   Handbook for this neighborhood or that neighborhood or this

25   street or that street.  It's Marine Corps Base Hawaii, the

 1   Community Handbook.  When people move there, again, into this

 2   gated community, they go all over the place.

 3        And I'll tell you the reason why -- and this is just

 4   aside -- I got involved in this case is 'cause my kids go to

 5   Aikahi.  A lot of military families go to Aikahi and they

 6   started talking about this.  And I said that's crazy; my kids

 7   go on the base for parties, I've been in those neighborhoods,

 8   everyone's been in those neighborhoods.  And that's not cool if

 9   you're living there and they're carrying out construction over

10   here and having an impact on the rest.

11        I understand the argument they say, Well, there's no way

12   dust and contamination or whatever we're doing in this

13   neighborhood could have impacted the rest of the base.  That's

14   just -- that's a question of fact for the jury.

15             THE COURT:  Well, yeah, I think that's sort of the

16   downstream --

17             MR. SMITH:  Yes, I agree.

18             THE COURT:  But, so this is not a class action,

19   right?  Class action's denied.

20             MR. SMITH:  Yes.

21             THE COURT:  So we're looking at a group of

22   individual plaintiffs.  And the argument that I hear from the

23   defendants is that each of the individual plaintiffs need to be

24   as if they are each filing a separate complaint, and there has

25   to be sufficient description as to the particular harm or the

1   particular exposure or the particular misrepresentation that

2   was made to each of them.

3        So what I hear you saying is, well, the whole fact that

4   they're each given the Community Handbook, that's the

5   misrepresentation.  And then it goes back to what sort of

6   reliance.  I guess you're arguing just general reliance because

7   then they became renters, they became tenants.

8            MR. SMITH:  Tenants, yes.

9            THE COURT:  But with regard to the other claims that

10  are being made, there has to be a specific, you know -- unless

11  all -- unless the only thing that they're claiming is failure

12  to warn and the misrepresentation in the handbook.  That's --

13  if that's what they're claiming, that's what they're claiming.

14  And you're saying they all got the handbook and this was all

15  misrepresentation.

16       But there's so many different claims, I think there's a

17  lot of credence that can be given to the defendants' argument

18  because it's an individual plaintiff situation as opposed to a

19  class action, that they have to each allege specific

20  information as to their specific exposure or reliance or

21  whatever -- what have you.

22       Unless what you're saying it's basically a Community

23  Handbook attached to the lease, that's the misrepresentation,

24  then, you know, I understand that.

25            MR. SMITH:  Let me -- yeah.  No, I appreciate that,

 1    Your Honor.  And first I'm not going to -- so the pleading

 2    standard's really no different on a Rule 23 than under an

 3    individual.  I mean, you both have to allege the sufficient

 4    facts to establish plausibility.  That being said, if the issue

 5    for the Court is that you want a specific factual pleading for

 6    each plaintiff, that can certainly be done.  And that wasn't --

 7    that certainly wasn't any kind of, like, intentional oversight.

 8    Instead, it was really this is the complaint that we survived

 9    all these different challenges on that the Court had been using

10    and that's how we understood --

11             THE COURT:  Right.  But that's a class action and

12    that's the distinction here.  The individual --

13             MR. SMITH:  No, I get it.  I see your point.

14             THE COURT:  Okay.

15             MR. SMITH:  That said, Your Honor, by the way, the

16    class wasn't denied.  There was a recommendation of denial

17    that -- by Judge Chang.

18             THE COURT:  Right.

19             MR. SMITH:  We opposed that.

20             THE COURT:  Yes.

21             MR. SMITH:  Between -- sort of between us chickens,

22    I obviously have my own -- you know, it was very -- in my mind

23    very clear black-letter Ninth Circuit law that that decision

24    was wrong based upon the individual.  The reason was the

25    individualized damages was the key issue, and under the Ninth

1   Circuit that's not a basis to deny class.

2        And so it was -- we challenged that finding and

3   recommendation.  And during that intervening period is when it

4   was -- the case settled before there was an outcome on that.

5   So yes, there was a recommendation of denial; there was no

6   order adopting that yet.

7             THE COURT:  Right.

8             MR. SMITH:  That was subject to change --

9             THE COURT:  But where we are in this case, though,

10   is they're individuals, not class.

11             MR. SMITH:  You're right, Your Honor.

12             THE COURT:  Okay.  Anything else you want to --

13             MR. SMITH:  Yes, if I could just briefly walk

14   through some of those challenges.  So I think I dealt with the

15   IIED.  I do understand and I'm happy to change up an

16   individualized pleading to one that per plaintiff can be done.

17   Is that the most effective?  I personally think it's more

18   effective and makes more sense to do it under the context of

19   discovery, but I see your point.

20        With respect to the -- this reliance argument on the

21   omissions, the reliance is essentially when you fail to

22   disclose material facts, reliance is presumed.  And so the key

23   issues of failure to disclose on that reliance issue is

24   satisfied.

25        And then with respect to their specific reliance issue of

1   the Community Handbook, that's expressed, it's part of the

2   lease, they entered the lease.  And so you can't as a tenant

3   go, Why do I have to rely on this provision when --

4          THE COURT:  Yeah.  No, as long as you plead it.  And

5   I think that's what they're saying, you just have to plead the

6   reliance.  The reliance is, We entered into the lease and we

7   brought our kids here, you know, and then that's what it is.

8          MR. SMITH:  Right.  And we do plead that, although I

9   don't think we say we relied, and -- I understand.

10         THE COURT:  Yeah.  Okay.

11         MR. SMITH:  Real quickly, on the method of

12   competition, there are landlords in Hawaii that disclose

13   pesticides.  That is -- and then in the context of this case,

14   we have a landlord that did not disclose pesticides despite

15   knowledge that the community was impacted.  That is unfair

16   competition.  And under the statute anyone can bring that

17   challenge for the impact, for the method of competition.  That

18   can be a consumer, that actually could be you or me; it's that

19   broad.  It's not just a impacted landlord, for example, who

20   feels that they were unfairly competed against.  So I wanted to

21   clarify that under the law.

22         THE COURT:  Okay.

23         MR. SMITH:  With respect to the UDAP challenge, Your

24   Honor --

25         THE COURT:  Yeah.

1          MR. SMITH:  -- it's kind of odd.  They're asking me

2    to change Gillmor's decision on the factual stuff, and I'm

3    asking to change it on the UDAP, right?

4          Under the UDAP issue, I -- the reason I think it's

5    wrong -- and the reason why we repled it and we've asked, and I

6    don't think there's an opposition in their reply to submit it

7    to the Supreme Court -- is the issue is on this consumer

8    standing really that goods and services language.  Sale under

9    the statute is defined as lease.  So the lease of goods and

10   services satisfies consumer standing.

11         So the real question is is goods and services in Hawaii

12   broad enough to include rental properties?  Now, I recognize

13   the Intermediate Court of Appeals under Sierra, McKenna walk

14   down.  I get that.  But you have to look at that reasoning of

15   Judge Foley that is an outdated understanding of property law

16   based upon just this transfer of property.  And one of the

17   cases -- and this was -- and some of the earlier pleadings of

18   their case, but I think we probably are all aware of it, the

19   *Lemle v. Breeden* case where the Hawaii Supreme Court first

20   recognized the warranty of habitability and fitness,

21   specifically said the reason why we're doing this is we're

22   getting away from this outmoded idea of property in Hawaii.

23   It's just a transfer of a property interest instead and it

24   relies upon consumer cases in that case.

25         And the reason is because Hawaii's moved beyond that.

1    They look at rental leases in terms of contract as an exchange

2    of a bundle of rights for different goods and services.  And so

3    this entire reasoning of those ICA opinions, which frankly is

4    commandeered by Judge Foley, I just respectfully suggest it's

5    incorrect.  And --

6              THE COURT:  Well, but it's the law right now.

7              MR. SMITH:  Well --

8              THE COURT:  And the State Court, the highest court

9    that's interpreted, 'cause the Hawaii Supreme Court has

10   declined to accept cert on those cases, that's the

11   interpretation of Hawaii law.  So I understand what you're

12   argument is.

13             MR. SMITH:  Okay.

14             THE COURT:  It's just, you know, that's the highest

15   court.

16        On the UMOC claim, though, there is a requirement that

17   you -- that a plaintiff, one of the elements that they show

18   which causes injury to business or property.

19             MR. SMITH:  Yes.  So that injury is that they

20   entered the lease, they expended money for because of this

21   unfair method of competition.

22             THE COURT:  So you're saying their property.

23   Obviously, there's no business, right?  So the --

24             MR. SMITH:  Obviously, there's no business, yes.

25             THE COURT:  -- injury to the property, you're saying

1    to their lease?

2              MR. SMITH:  Yes.

3              THE COURT:  What was injured to their lease?

4              MR. SMITH:  Their actual money is their property as

5    well.  It's not just limited to real property; it's money

6    damages.  So unfair methods of competition isn't only correct

7    if you have injury to a car or something.  It's to correct the

8    nature of the competition to make sure there's fair

9    competition.  So you don't have to have injury to the house --

10             THE COURT:  Okay.  But I can see if your argument is

11   because of these misrepresentations, I paid five times on a

12   lease --

13             MR. SMITH:  Yes.

14             THE COURT:  -- than I would have if I -- if there

15   was fair competition because of some unfair act that the --

16   but -- but correct me if I'm wrong -- is that they can't show

17   that they wouldn't have spent that much money, at least, if not

18   more, if they went outside the base and rented a house.  That's

19   the unfair competition.

20        Unfair competition is I come up to you and I say, "All

21   those other places you're looking at, they've all been deemed

22   uninhabitable by the State of Hawaii.  So that's why you only

23   pay $1,500 a month.  But what I'm going to give you is a lease

24   for a property.  Even though it costs twice a much, 3,000, it's

25   the only place that's been deemed habitable by the State of

1  Hawaii."  Okay.  It's a completely false representation and so

2  forth.  But that's an unfair method of competition 'cause now

3  I'm saying these are inferior and, in fact, illegal households

4  for you to rent, and I have the only legal one, but as a result

5  I'm ripping you off because I'm charging you twice as much.

6          MR. SMITH:  Sure.

7          THE COURT:  That's to me a colorable UMOC claim.

8  But what your folks are doing is they're staying on base.  And

9  even if I assume what you're saying is true, that they were

10  enticed because of this misrepresentation in the Community

11  Handbook so they sort of whitewashed this whole pesticide

12  thing, they're paying X number of dollars which arguably is the

13  same or less than market rate if they went to an outside --

14          MR. SMITH:  Sure.

15          THE COURT:  -- landlord.

16          MR. SMITH:  And in fact, I did -- I did that

17  absolutely.  And again, this an aside, but my cousin and her

18  Marine Corps husband who are PCSing here did exactly that

19  because of these issues over contamination, have gone outside

20  and rented elsewhere for less at a place that -- that doesn't

21  have these contamination issues.

22      Absolutely Marine Corps Base Hawaii and OMC, the Forest

23  City, have --

24          THE COURT:  That's not what's pled.

25          MR. SMITH:  It is.  They had a competitive advantage

1   by not disclosing this.  And had they disclosed it, those

2   tenants then could have made that choice to go elsewhere and

3   they didn't have that choice.  It's absolutely a competitive

4   advantage.  It's no different than -- you know, lying about

5   someone else's flaws is really no different than hiding your

6   own in a competitive marketplace.

7            THE COURT:  So that's what your saying the nature of

8   the competition is?

9            MR. SMITH:  Yes.  And the harm is that they were

10  able -- the harm to consumers -- or pardon me -- to the harm in

11  this case is that they got more than they should have for these

12  leases and we paid --

13           THE COURT:  How do you prevent these people from not

14  renting outside of Marine Corps Base Hawaii?

15           MR. SMITH:  What do you mean?  I don't understand.

16           THE COURT:  So unfair competition is somehow you do

17  something that prevents people from seeking comparable goods or

18  services --

19           MR. SMITH:  Right.

20           THE COURT:  -- from a competitor, right?  So somehow

21  they blocked them from looking at craigslist or the Star

22  Advertiser or something, you know, or, you know, any other

23  source of information that would have said, "Okay.  We can rent

24  this house on base for X" --

25           MR. SMITH:  Yep.

1          THE COURT:  -- "and we can go and rent in Kaneohe

2   for, you know, 1X," or whatever.

3          MR. SMITH:  Yep.

4          THE COURT:  Yeah.

5          MR. SMITH:  Right.

6          THE COURT:  So what's the nature of the competition?

7          MR. SMITH:  So the question there is would it be a

8   material fact to renters, right?  So if we have two equal

9   properties and they have pricing -- right? -- for whatever it

10  is, and this one is a contaminated community and they don't

11  disclose that, yes, you're on craigslist or whatever and you're

12  saying, "Well, you know, I'm a military family.  Essentially

13  the leases are the same pricing.  I'm going to go here,"

14  because frankly we all know that Kailua and large parts of

15  Kaneohe and Mololani and everywhere else, they separate based

16  upon the age, right?

17      But so if this is a contaminated property, that then

18  changes the competitive balance for landlords and people who

19  are renting properties off of Marine Corps Base Hawaii.

20          THE COURT:  Okay.

21          MR. SMITH:  So, Your Honor, I think -- I think we've

22  covered all the issues, but --

23          THE COURT:  Thank you very much.

24          MR. SMITH:  -- thank you very much.  Okay.

25          THE COURT:  All right.  Mr. Whatoff, I'll give you a

1    brief response.

2              MR. WHATTOFF:   Thank you, Your Honor.   I'll be very

3    brief.

4        This issue of setting of the Tier 2 EALs, that's what the

5    Pesticide Soil Management Plan is.   That lets -- we will assess

6    these higher levels; they were approved by the Department of

7    Health.

8        Now, plaintiffs had pled that what happened here is that

9    those Tier 2 EALs were accepted, they left them in place, and

10   then these plaintiffs lived around these Tier 2 EALs.   Well,

11   that would be a different complaint than what they have here.

12       The reason they can't plead that complaint is 'cause

13   that's not what happened here.   They did the testing.   There

14   were some Tier 2 exceedances.   There were some that were fine.

15   They said, Let's be as conservative as possible; let's remove

16   everything.   And for that reason plaintiffs can't plead what

17   they were just describing to you here, Your Honor.   All of that

18   is outside the pleadings 'cause it didn't take place.

19       On unfair methods of competition, I think you're

20   absolutely right, Your Honor.   That *Davis v. Four Seasons* case

21   is directly on point.   What plaintiffs are describing are UDAP

22   damages.   Unfair method of competition damages are very clear:

23   You have to be harmed by the effect on competition, not these

24   other extraneous situations.

25              Thank you, Your Honor.

 1            THE COURT:  All right.  Thank you.  I consider the

 2  matter submitted.  The court will issue a written decision

 3  regarding the same fully -- if not the full decision by the end

 4  of the month, an outline, and we'll certainly get it to you

 5  next month 'cause we're really getting close to the end of this

 6  month.

 7            MR. WHATTOFF:  Your Honor, if I could be -- one

 8  issue very quickly.

 9            THE COURT:  Yes.

10            MR. WHATTOFF:  We filed a motion to transfer the

11  other cases to this courtroom.

12            THE COURT:  Yes, and so I need to talk to my

13  colleagues.

14            MR. WHATTOFF:  Okay.

15            THE COURT:  But my thought is -- and thank you for

16  reminding me that because I wanted to talk to you.  My

17  recommendation to my colleagues is that the cases not be

18  transferred but that we all agree that I would handle all the

19  substantive motions in the cases and they would then apply to

20  all of their cases, and that one magistrate judge handle all of

21  these matters.  So I believe it's whoever is assigned, which is

22  Judge Mansfield.  So he would handle all of the discovery, all

23  of the other issues, so you would have consistency in that.

24       And -- but if they should proceed to trial, everybody's

25  going to try their own cases rather than all the cases come to

1   me and I try all of them.  But certainly it makes sense I think

2   for judicial economy that one judge, rightly or wrongly, makes

3   the substantive motions decision and one judge, again rightly

4   or wrongly, make all the discovery rules and rulings so that

5   you have consistency and you have one place to go to seek an

6   answer, so to speak.  And so I just have to follow up, make

7   sure my colleagues -- I can't bind them to that, but I think

8   that's the fairest way.

9       And then if they do go to trial, I don't see why, quite

10  frankly, I should do all the trials.  But that's what -- and so

11  I hope to get back to you within about a week of today and I

12  will follow through, yeah.  So thank you very much.

13          MR. SMITH:  Thank you, Your Honor.  I was just going

14  to -- on that same issue, we intended to file a response; we

15  just weren't sure.

16          THE COURT:  You don't have to because I've been

17  talking to Chief Judge Seabright.  I wanted to run it by him

18  and Judge Mansfield first.  I don't want to bind Judge

19  Mansfield to something, you know, that he might have objections

20  to.  But he's fine with that, as is Chief Judge Seabright, so I

21  just need to talk to my colleagues because it's -- you know, I

22  can't tell them, This is the way we're going to do it.  We have

23  to do it by collaboration.  If one of them feels differently,

24  I'll let you know.

25          But I'm hoping -- I think they would be okay with that

1  because, you know, I think it's going to be upfront work.

2        MR. SMITH:  To be wholly honest, Judge, what we had

3  actually intended on filing was essentially a response saying,

4  Yeah, we support the idea.  We really think consolidation

5  rather than transfer for some of those same reasons, that you

6  want to have consistency over, like you said, rightly or

7  wrongly, the outcomes.  You want to have them to apply --

8        THE COURT:  Right.

9        MR. SMITH:  -- like on the pretrial issues as well.

10  So, yeah, to that extent we agree.

11        THE COURT:  Yeah.  So, I mean, I think that makes

12  the most sense and, quite frankly, the lowest number then would

13  be Judge Gillmor and she's not interested in taking all these

14  cases.  I don't blame her, so -- she's on senior status.  So

15  then it would be for me to take all of the cases and I think

16  that makes sense for the ruling.  I'm not sure that they all

17  need to be tried by the same judge, but I think definitely the

18  substantive rulings and the discovery need to be done in a

19  uniform manner.

20      So I think that accomplishes largely what you folks are

21  seeking.  Then we can talk -- you guys can talk with Judge

22  Mansfield in terms of the scheduling of, you know, each of

23  trials should we get to that issue.  Okay?

24        MR. WHATTOFF:  Thank you, Your Honor.

25        THE COURT:  Thank you very much.  Have a good day.

1   We're in recess.

2           (Proceedings concluded at 10:37 A.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3              I, DEBRA READ, Official Court Reporter, United

 4    States District Court, District of Hawaii, do hereby certify

 5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6    true, and correct transcript of the stenographically reported

 7    proceedings held in the above-entitled matter and that the

 8    transcript page format is in conformance with the regulations

 9    of the Judicial Conference of the United States.

10
               DATED at Honolulu, Hawaii, August 25, 2017.
11

12

13                          /s/ Debra Read

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT