UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KENNETH LAKE, CRYSTAL LAKE, HAROLD BEAN, MELINDA BEAN, KYLE PAHONA, ESTEL PAHONA, TIMOTHY MOSELEY, ASHLEY MOSELEY, RYAN WILSON, and HEATHER WILSON,<br><br>        Plaintiffs,<br><br>  vs.<br><br>OHANA MILITARY COMMUNITIES, LLC, FOREST CITY RESIDENTIAL MANAGEMENT, INC., DOE DEFENDANTS 1-10,<br><br>        Defendants. | CIV. NO. 16-00555 LEK |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT NO. 1 AND NO. 2**

On May 22, 2019, Defendants Ohana Military Communities, LLC ("Ohana") and Forest City Residential Management, LLC ("Forest City" and collectively, "Defendants") filed their: Motion for Summary Judgment No. 1 based upon Plaintiffs' Inability to Prove a Required Element of their Claims ("Motion 1"); and Motion for Summary Judgment No. 2 based upon Plaintiffs Inability to Prove Damages ("Motion 2").[1] [Dkt.

---

[1] Defendants also filed their Motion for Summary Judgment No. 3 Addressing Specific Counts and Plaintiffs ("Motion No. 3"). [Dkt. no. 147.] Motion No. 3 will be addressed separately.

nos. 150, 152.] On July 1, 2019, Plaintiffs Kenneth Lake, Crystal Lake, Harold Bean, Melinda Bean, Kyle Pahona, Timothy Moseley, Ashley Moseley, Ryan Wilson, and Heather Wilson ("Plaintiffs") filed their memorandum in opposition to Motion No. 1 ("Opposition 1") and their memorandum in opposition to Motion No. 2 ("Opposition 2"). [Dkt. nos. 168, 166.] On July 8, 2019, Defendants filed their reply in support of Motion 1 and their reply in support of Motion 2. [Dkt. nos. 172, 173.]

Motion 1 and Motion 2 ("Motions") came on for hearing on July 19, 2019. On August 8, 2019, an entering order was issued informing the parties of the Court's rulings on the Motions. [Dkt. no. 181.] The instant Order supersedes that entering order. Defendants' Motions are hereby granted in part and denied in part for the reasons set forth below. Defendants Motions are granted insofar as summary judgment is granted as to all claims except Plaintiffs Kenneth Lake, Crystal Lake, Kyle Pahona, Ryan Wilson, and Heather Wilson's claims asserting that construction dust, in general and without regard to the contents of the dust, constituted a nuisance.

## BACKGROUND

Plaintiffs are former residents of housing at Kaneohe Marine Corp Base Hawaii ("MCBH").[2] [First Amended Complaint, filed 9/20/17 (dkt. no. 75), at ¶¶ 6-10; Answer to Pltfs.' First Amended Complaint [Doc. 75] ("Answer"), filed 6/29/18 (dkt. no. 99), at ¶¶ 6-10 (admitting that they were former residents).] The crux of Plaintiffs' claims is that the soil in at least some of the residential neighborhoods at MCBH is contaminated, and Defendants failed to perform adequate remediation measures and failed to disclose the contamination to Plaintiffs. The claims that remain in this case are: breach of contract against Ohana ("Count I"); breach of the implied warranty of habitability against Ohana ("Count II"); a Haw. Rev. Stat. Chapter 521 claim against Defendants ("Count III");[3] a negligent failure to warn claim against Defendants ("Count V");

---

[2] At the time the First Amended Complaint was filed, Kyle Pahona and Estel Pahona were still residing at MCBH. [First Amended Complaint at ¶ 8.] Estel Pahona's claims have been dismissed. [Stipulation for Partial Dismissal: Dismissal with Prejudice of All of Pltf. Estel Pahona's Claims in the First Amended Complaint [75] and Order, filed 4/24/19 (dkt. no. 139).] It is not clear whether Kyle Pahona still resides at MCBH.

[3] The portion of Count III based on Haw. Rev. Stat. § 521-42(a)(1) has been dismissed with prejudice. Order Granting in Part and Denying in Part Defs.' Motion to Dismiss and/or Strike Pltfs.' First Amended Complaint [Dkt 75], filed 5/31/18 (dkt. no. 98) ("5/31/18 Order"), at 17, *available at* 2018 WL 2449188.

a negligent infliction of emotional distress ("NIED") claim and

an intentional infliction of emotional distress ("IIED") claim

against Defendants ("Count VI"); a fraud claim against

Defendants ("Count VII"); a negligent misrepresentation claim

against Defendants ("Count VIII"); and a nuisance claim against

Defendants ("Count XI").[4]

## I.   **Relevant Facts**

### A.   **OCPs in General**

The parties agree that organochlorinated pesticides

("OCPs") were commonly used in Hawai`i.  [Concise statement of

facts in supp. of Motion 1 ("Motion 1 CSOF"), filed 5/22/19

(dkt. no. 151) at ¶ 1; concise statement of facts in supp. of

Opp. 1 ("Opp. 1 CSOF"), filed 7/1/19 (dkt. no. 169), at ¶ 1

(admitting that portion of Defs.' ¶ 1).]  OCPs

> were used for termite control in and around
> wooden buildings and homes from the mid-1940s to
> the late 1980s.  [OCPs] included chlordane,
> aldrin, dieldrin, heptachlor, and
> dichlorodiphenyltrichloroethane (DDT).  They were
> used primarily by pest control operations in
> Hawaii's urban areas, but also by homeowners, the
> military, the state, and counties to protect
> buildings against termite damage.  In the 1970s
> and 1980s the U.S. Environmental Protection
> Agency (EPA) banned all uses of these [OCPs]

---

[4] Harold Bean and Melinda Bean's ("the Beans") and
Timothy Moseley and Ashley Moseley's ("the Moseleys) nuisance
claims have been dismissed with prejudice.  5/31/18 Order, 2018
WL 2449188, at *10.

> except for heptachlor, which can be used today
> only for control of fire ants in underground
> power transformers.  Chlordane was the most
> widely used [OCP] against termites in Hawai`i.
> Termiticides were commonly applied directly to
> soil beneath buildings or beneath slab
> foundations and around the foundation perimeter
> for new construction. . . .  These pesticides
> break down slowly in the environment, application
> rates were relatively high, and applications may
> have been repeated over time.  As a result, these
> [OCPs] may sometimes still be found in treated
> soils at concentrations detrimental to human
> health.

[Motion 1 CSOF, Decl. of Randall C. Whattoff ("Whattoff

Decl. 1"), Exh. 43 ("Past Use of Chlordane, Dieldrin, and other

Organochlorine Pesticides for Termite Control in Hawai`i: Safe

Management Practices Around Treated Foundations or During

Building Demolition," by the Hawai`i Department of Health

("HDOH"), Hazard Evaluation and Emergency Response Office

("HEER"), dated September 2011) at 1.]

The United States Department of Health and Human

Services ("USDOH"), Public Health Service, Agency for Toxic

Substances and Disease Registry, has stated that "[e]veryone in

the United States has been exposed to low levels of chlordane"

and "the ban on chlordane did not eliminate it from your

environment, and some of your opportunities for exposure to

chlordane continue."  [Whattoff Decl. 1, Exh. 42 (excerpts of

Toxicological Profile for Chlordane, dated May 1994) at 3.]

> Today, people receive the highest exposure
> to chlordane from living in homes that were

treated with chlordane for termites.  Chlordane
may be found in the air in these homes for many
years after treatment.  Houses in the deep south
and southwest were most commonly treated.
However, chlordane use extended from the lower
New England States south and west to California.
**Houses built since 1988 have not been treated
with chlordane for termite control.** . . .

Over 50 million persons have lived in
chlordane-treated homes. . . .

[Id. at 3-4 (emphasis added).]  In Hawai`i,

[Chlordane and dieldrin] were both heavily used
in Honolulu, before being banned, for ground
treatment of termites and were sold to the public
through home and harden [sic] outlets up until
approximately 1984.  Based on research of records
at the State Department of Agriculture, hundreds
of thousands of gallons of these chemicals were
applied for termite control in addition to that
imported for agricultural purposes.  Personal
communication with exterminator for domestic
termite control, indicate copious quantities were
applied (e.g., saturating the soil) as the
standard practice.  It is, therefore,
hypothesized that the source of chlordane and
dieldrin in the [Sand Island Wastewater Treatment
Plant ("SIWWTP"] wastewater (influent and
effluent) is from chemicals applied from 1950 to
1988 leaching from the soil and entering the
sewer system as a component of infiltration and
inflow (I/I).  Since these were essentially the
only chemicals in use for ground control of
termites during much of this period, all areas of
the City were probably affected.  Due to the
methods of construction and to application
trends, residential areas were more heavily
treated than commercial or industrial
areas. . . .  Also, during this period, homes
(their yards) were required to be treated for
termites before they could receive federal loan
guarantees.  This practice led to almost
universal contamination of residential areas by
these pesticides.

[Whattoff Decl. 1, Exh. 39 (App'x D to the City and County of Honolulu's Application for Variance Related to Sand Island Wastewater Treatment Plant) at D-1 to D-2.]

HDOH uses a two-tiered system to analyze the presence of OCPs at a site. [Motion 1 CSOF at ¶ 2; Opp. 1 CSOF at ¶ 2 (admitting that portion of Defs.' ¶ 2).]

> *Environmental Action Levels* (EALs) [are used] to quickly screen soil, soil gas and groundwater data for potential environmental hazards. As reviewed below, individual action levels were developed to address each of the environmental hazards described in Section 1.2 for each contaminant listed in the lookup tables . . . . **The lowest action level represents the concentration of the contaminant in the respective media where the threat to human health or the environment is considered to be insignificant under any site condition.** This is selected as that contaminants *Tier 1* EAL. . . .
>
> The presence or absence of potential environmental hazards at a contaminated site is determined by the direct comparison of soil, groundwater and/or soil gas data to Tier 1 EALs for targeted contaminants of concern. Exceeding the Tier 1 EAL for a specific chemical does not necessarily indicate that the contamination poses a significant threat to human health or the environment, only that additional evaluation is warranted. The level of detail required for the additional evaluation will vary. In some cases it may be more cost-beneficial to simply remediate the site to the Tier 1 EALs than to conduct an advanced evaluation. A more detailed evaluation of specific environmental hazards is generally warranted in cases where significant cleanup costs may be incurred, where public sensitivity of the site is high or where long-term, *in-situ* management of the contamination is being considered.

[Whattoff Decl. 1, Exh. 44 (Evaluation of Envtl. Hazards at Sites with Contaminated Soil & Groundwater, Vol. 1: User's Guide, Hawai`i Ed., by HDOH Envtl. Mgmt. Div., dated Fall 2011, revised January 2012) at pg. 2-1 (emphasis added).] Where a more detailed evaluation is necessary, the specific site should be discussed with HDOH. [Id. at pg. 1-10.] A site-specific evaluation is done, and Tier 2 EALs are created. [Id. at pgs. 3-1 to 3-12.]

B. **MCBH Housing**

MCBH includes housing for more than 2,000 families of Marines. MCBH currently has thirteen residential neighborhoods. [Motion 1 CSOF, Decl. of Dennis Poma ("Poma Decl.") at ¶¶ 10-11.[5]] They are:

| Neighborhood | No. of Units | Year of Construction |
|---|---|---|
| Hana Like | 276 | 1992 |
| Hawaii Loa | 237 | 1999 |
| Heleloa | not provided | 1940 (renovated 2009) |
| Kaluapuni | 32 | 1963 (redeveloped 2006) |
| Kapoho | 10 | 1957 and 1976 (redeveloped 2007 and 2008) |
| Mokapu Court | 14 | 1957 (redeveloped 2007) |
| Mololani | 765 | 1960 (redeveloped 2008-12) |
| Nani Ulupau | 40 | 1992 (redevelopment |

_____

[5] Dennis Poma is the chief executive officer of Advanced Compliance Solutions, Inc. ("ACSI"). He is a consultant and civil engineer who focuses on environmental issues. [Poma Decl. at ¶¶ 1-2.] He was involved with residential housing projects at MCBH from September 2009 to 2018. [Id. at ¶¶ 6-9.] His company was "responsible for environmental management for all Ohana projects related to the Navy and Marine Corps." [Id. at ¶ 7.]

```
                                          scheduled in 2019)
Pa Honua I             54                 1965 (redeveloped 1999)
Pa Honua II            184                1966 (redeveloped 2002)
Pa Honua III           212                1966 (redeveloped 2005)
Ulupau                 218                1976 (redeveloped 2011-14)
Waikulu                not provided       1941-1976 (redeveloped
                                          before Poma worked on MCBH)
```

[Id. at ¶¶ 11.a-m.]  Pa Honua II was demolished and rebuilt as

part of the military construction ("MILCON") program.  [Id. at

¶ 20.]  Hana Like, Hawaii Loa, Kaluapuni, Mokapu Court,

Nani Ulupau, and Pa Honua I were also part of the MILCON

program.  [Motion 1 CSOF, Decl. of Chris Waldron ("Waldron

Decl.") at ¶ 12(a).[6]]  The other neighborhoods were redeveloped

by Ohana through a Public-Private Venture ("PPV").  [Waldron

Decl., Exh. 30 (Marine Corps Base Hawaii: MILCON Housing

Projects Pesticide Soil Management Fact Sheet, dated May 2014)

at 1.]

        Ohana leases real property at MCBH, and Forest City

manages the property on Ohana's behalf.  [First Amended

Complaint at ¶ 13; Answer at ¶ 13 (admitting those portions of

Pltfs.' ¶ 13).]

_____

        [6] Chris Waldron is the principal of Pioneer Technologies
Corporation.  He is a consulting scientist who focuses on
environmental issues.  [Waldron Decl. at ¶¶ 1-2.]  Mr. Waldron
became involved with the MCBH housing projects in October 2005
and worked on drafts of the Pesticide Soils Management Plan
("PSMP") for Ohana.  Mr. Waldron also conducted an extensive
review of the relevant records that preceded his work with the
MCBH housing projects.  [Id. at ¶¶ 6-8.]

Plaintiffs lived in the following MCBH neighborhoods:

| Plaintiffs | Neighborhood | Period |
|------------|--------------|--------|
| Lakes | Mololani | 6/4/12-12/23/15 |
| Beans | Pa Honua II | 8/24/08-1/27/10 |
| | Hawaii Loa | after 1/27/10 |
| Kyle Pahona | Ulupau | 11/13/13-11/30/16 |
| Moseleys | Mololani | before 9/1/09 |
| | Waikulu | 9/1/09-3/1/12 |
| | Pa Honua II | March 2012 |
| Wilsons | Hawaii Loa | not stated |

[Poma Decl. at ¶¶ 16, 20, 22, 23, 26, 27, 30, 32.] According to
the First Amended Complaint: Harold Bean and Melinda Bean ("the
Beans") lived in the Hawaii Loa neighborhood from January 2010
to January 2012; [First Amended Complaint at ¶ 7;] Timothy
Moseley and Ashley Moseley ("the Moseleys") lived in the
Mololani neighborhood from July 2008 to June 2009; [id. at
¶ 9.a;] the Moseleys lived in the Pa Honua II neighborhood from
March 2012 to November 2012; [id. at ¶ 9.c;] and Ryan Wilson and
Heather Wilson ("the Wilsons") lived in the Hawaii Loa
neighborhood from 2006 to 2015, [id. at ¶ 10]. Defendants
admitted these allegations from Plaintiffs' paragraphs 7, 9.a,
and 10, [Answer at ¶¶ 7, 9, 10,] but denied the allegation from
Plaintiffs' paragraph 9.c because Defendants were "without
knowledge or information sufficient to form a belief as to [its]
truth," [Answer at ¶ 9].

Forest City's Community Handbook – Marine Corps
Neighborhoods ("Community Handbook") states:

> Chlordane was one of the most common pesticides
> applied to the soil around homes and businesses
> throughout the United States for protection
> against termites from 1948 to 1988. Other
> pesticides used in and around housing to prevent
> insect infestation and disease outbreak have also
> been banned. Although chlordane and other
> pesticides are no longer used, they may be found
> in soils under and around housing constructed in
> both civilian and military communities. Families
> can safely work and play in their yards; however,
> we recommend residents use prudent practices by
> thoroughly washing their hands after direct soil
> contact and washing all plants and vegetables
> grown on-site before consuming.

[Opp. 1 CSOF, Decl. of Kyle Smith ("Smith Decl. 1"), Exh. 8 (Community Handbook) at 12.] The Community Handbook is incorporated as part of Plaintiffs' MCBH leases. [Concise statement of facts in supp. of Motion 2 ("Motion 2 CSOF"), filed 5/22/19 (dkt. no. 146), Decl. of Randall C. Whattoff ("Whattoff Decl. 2"), Exh. T (Kyle Pahona's Lease Agreement for 11/13/13 to 5/31/14 ("Pahona Lease")) at OHANA-FCRM 016512.[7]]

## C.  OCPs at MCBH

### 1.  In General

An Environmental Baseline Survey for Public Private Venture, dated August 2006, by Environmental Science International for the Department of the Navy, Commander, Pacific

---

[7] Defendants describe Kyle Pahona's lease as "an exemplar of all Plaintiffs' lease agreements." [Whattoff Decl. 2 at ¶ 23.]

Division, Naval Facilities Engineering Command ("EBS"),[8] stated:
"Pesticides/Herbicides may be present in the soil in all
neighborhoods.  These were legal applications and do not require
remediation (Category 1); however, future construction that may
disturb such soils may require environmental, as well as safety
and health, controls."  [Smith Decl. 1, Exh. 1 (excerpts of EBS)
at ES-2.]

Ohana established Tier 2 EALs for MCBH.  [Motion 1
CSOF at ¶ 4; Opp. 1 CSOF at ¶ 4 (admitting that portion of
Defs.' ¶ 4); Poma Decl., Exh. 23 (Final Pesticide Soils
Management Plan, Ohana Military Cmtys., LLC Public-Private
Venture Housing-Hawaii, prepared by Parsons, dated Feb. 2007
("2007 PSMP")) at 7-20.]  The HDOH, HEER Office issued a
concurrence letter for the 2007 PSMP.  [Poma Decl., Exh. 27
(letter dated 3/23/07, to Michael B. Phelps, P.E., Senior
Project Manager, PARSONS, from John Peard, Project Manager, HDOH
("Concurrence Letter")).]

Mr. Poma testified that the PSMP applies to all MCBH
neighborhoods.  [Smith Decl. 1, Exh. 2 (excerpts of trans. of
1/7/19 depo. of Dennis S. Poma, P.E. ("Poma Depo.")) at 144.]
The 2007 PSMP states:

[8] The EBS was ordered "to facilitate the housing public-
private venture (PPV) between the [Navy] and 'best qualified'
developer."  [Smith Decl. 1, Exh. 1 (EBS) at ES-1.]

Tier 1 EALs are designed to be protective of
human health (i.e., direct-exposure) and other
potential environmental concerns (e.g., future
soil-to-groundwater impacts and urban ecological
impacts).  Human health Tier 1 soil EALs for
pesticides were derived based on the following
common assumptions (refer to HDOH [2005] for
details on all other input assumptions):
1) unrestricted (i.e., residential) land use;
2) exposure to COPCs in soil via incidental
ingestion, dermal contact, and inhalation of
volatiles/particulates; 3) a target cancer risk
and noncancer hazard of one-in-one million (i.e.,
1E-06) and one, respectively; and 4) exposure for
350 days/yr for 30 years as a child/adult.

Site-specific Tier 2 EALs for the target
pesticides were derived from HDOH (2005) human
health direct exposure Tier 1 values based on an
alternative target cancer risk level of 1E-05
[(i.e., one-in-one-hundred-thousand)] and the
potential for cumulative cancer effects from
exposure to multiple pesticides.  All other
Tier 2 residential EAL human health (i.e., direct
exposure) exposure assumptions were the same as
those used by HDOH for Tier 1 EALs. . . .

[Poma Decl., Exh. 23 (2007 PSMP) at 10 (some brackets in

original).]  The 2007 PSMP also states:

All housing communities undergoing demolition and
construction must either be previously assessed
for pesticide-impacted soils . . . or, in the
absence of any previous testing, conservatively
assumed to contain pesticide-impacted soils
beneath all existing foundations and within
3 feet of the foundation.  For the purposes of
this Pesticide Soils Management Plan, "pesticide-
impacted soils" are defined as soils with
pesticide concentrations above the Tier 2
EALs . . . .

[Id. at 21.]

The PSMP was updated in February 2008 ("2008 PSMP") and July 2013 ("2013 PSMP"). [Poma Decl., Exh. 24 (2008 PSMP), Exh. 25 (2013 PSMP).] The 2007 PSMP and other documents show that there were no Tier 2 exceedances in any common areas of the MCBH neighborhoods. Poma Decl., Exh. 23 (2007 PSMP) at 17 (Table 4);[9] see also Poma Decl. at ¶¶ 47-49 (citing Poma Decl., Exh. 7 (Phase 2 Envtl. Site Assessment, Mololani Marine Corps Base Hawaii Family Housing Area, by Parsons, dated 10/1/07 ("Mololani Phase II ESA")) at 13; Exh. 10 (Phase 2 Envtl. Site Assessment, Ulupau Central/South Marine Corps Base Hawaii Family Housing Area, by Parsons, dated 10/1/07 ("Ulupau Phase II ESA")) at 3; Exh. 13 (Phase II Envtl. Site Assessment, Manning Court (Waikulu) Marine Corps Base Hawaii Family Housing Area, by Parsons, dated April 2007 ("Manning Court Phase II ESA")) at 14; Exh. 14 (Phase II Envtl. Site Assessment, Rainbow (Waikulu) Marine Corps Base Hawaii Family Housing Area, by Parsons, dated February 2007 ("Rainbow Phase II ESA")) at 16; Exh. 15 (Final Phase II Envtl. Site Assessment, NCO Row (Waikulu) Marine Family Housing Area, by Parsons, dated September 2006 ("NCO Row Phase II ESA")) at 12)).

_____

[9] Only four of the neighborhoods analyzed in the 2007 PSMP (Kapoho, Waikulu – Manning, Waikulu – NCO Row, and Waikulu – Rainbow) are at issue in this action. See Poma Decl., Exh. 23 (2007 PSMP) at 3, 16-17.

After the MCBH Tier 2 EALs were established in 2007, HDOH revised its Tier 1 EALs.  [Poma Decl. at ¶ 11.g.]  Thus, while 2007 testing reflected that some of the Mololani homes had OCPs above Tier 2 EALs, all of the results that constituted Tier 2 exceedances in 2007 "are at or below the current Tier 1 Environmental Action Levels."  [Id. at ¶ 11.g & n.8 (citing Poma Decl., Exh. 7 (Mololani Phase II ESA) at Figure 4 (OHANA-FCRM008212); HDOH, *Evaluation of Environmental Hazards at Sites with Contaminated Soil and Groundwater Volume 2: Background Documentation for the Development of Tier 1 Environmental Action Levels* at Table B-1 (Fall 2017) *available at* http://eha-web.doh.hawaii.gov/ehacma/documents/dd50f3bf-a630-4705-8edd-f13bb204e559).[10]]

HDOH did not review the 2013 PSMP because of on-going litigation, *i.e.*, Barber v. Ohana Military Communities, LLC, CV 14-00217 HG-KSC.  [Poma Decl. at ¶ 68.]  "Therefore, the modified Tier 2 EALs in the 2013 PSMP have never been used by [Defendants] to make soil decisions at MCBH."  [Id.]

---

[10] HDOH's Evaluation of Environmental Hazards at Sites with Contaminated Soil and Groundwater Volume 2: Background Documentation for the Development of Tier 1 Environmental Action Levels (Fall 2017) will be referred to as the "2017 HDOH Tier 1 Documentation."

## 2. **Previously Undeveloped Neighborhoods**

The homes in the Hana Like, Hawaii Loa, and Nani Ulupau neighborhoods were built on undeveloped land, after the use of OCPs was prohibited. [Id. at ¶¶ 11.a, b, h; Waldron Decl. at ¶¶ 13.a, b, g.] Thus, Defendants argue the soil in those neighborhoods was never treated with OCPs. [Motion 1 CSOF at ¶ 8.] Mr. Poma states:

> In 2015, Environet conducted a Phase II Environmental Site Assessment, which did not identify any OCPs over Tier 1 EALs. Ohana thereafter decided to have my company (ACSI) perform additional sampling with more representative decision units across the neighborhood to confirm that the Hana Like soils were not impacted by organo-chlorinated pesticides. This sampling and testing is summarized in a report entitled "Site Investigation Summary Report, Marine Corps Base Hawai`i (MCBH), Waikulu Lot B and Hana Like," [("Waikulu/Hana Like Site Report")] . . . . I participated in the creation of this report and I oversaw the testing that it summarizes. In Hana Like, no organo-chlorinated pesticides were detected above laboratory reporting limits in any of the samples.

Poma Decl. at ¶ 11.a (footnotes omitted); see also Waldron Decl. at ¶ 16 (stating "the Phase II site investigation confirmed that [OCPs] were not detected above laboratory reporting limits").

## 3. **Redeveloped Neighborhoods**

In the Kaluapuni neighborhood, soil tests conducted before the original homes were demolished in 2006 showed that some samples were above the current Tier 1 EAL, and some samples

were below it. [Waldron Decl. at ¶¶ 13.c (citing Waldron Decl., Exh. 32 (2003 test results for chlordane), Exh. 33 (2005 test results for chlordane)).] Post-demolition testing later in 2005 revealed significantly lower levels, "confirm[ing] that the natural mixing of soils that occurred during standard demolition activities significantly reduced the Chlordane concentrations." [Id. (citing Waldron Decl., Exh. 34 (May 2005 testing results), Exh. 35 (August 2005 testing results)).] The Navy/Marine Corps therefore "concluded that the residual concentrations of pesticides were acceptable and did not require further cleanup/remediation prior to construction of the new housing units," and Mr. Waldron opines that this conclusion was correct. [Id. at ¶ 13.d.]

In the Mokapu Court neighborhood, in August 2005, the soil at one of the nine original housing buildings was tested for chlordane prior to redevelopment, and chlordane was not detected. [Id. at ¶ 13.e (citing Waldron Decl., Exh. 35 (August 2005 testing results)).] The Navy/Marine Corps therefore "concluded that residual concentrations of pesticides in soil at Mokapu Court were acceptable (to the extent any in fact existed) and did not require cleanup/remediation prior to construction of the new housing units," and Mr. Waldron opinions that this conclusion was correct. [Id. at ¶ 13.f.] Mr. Waldron makes similar statements about the Pa Honua I neighborhood. [Id. at

¶¶ 13.h-i (stating no chlordane found in five composite samples tested in April 1995 (citing Waldron Decl., Exh. 36 (test results))).]

In the Pa Honua II neighborhood, in January 2000, the soil was tested in areas that had been identified as potentially containing chlordane. Of the twelve samples taken, "only two slightly exceeded the 2002 EPA preliminary remediation goal ('PRG') of 1.6 parts per million (ppm) (1.9 and 2.0 ppm)," and "[a]ll of these samples are significantly below the current Tier 1 EALs." [Id. at ¶ 13.j (citing Waldron Decl., Exh. 37 (testing results))).] In light of the results, and the fact that the chlordane concentrations would be reduced through the mixing of soil during construction, the Navy/Marine Corps concluded remediation was not necessary prior to construction, and Mr. Waldron opines that conclusion was correct. [Id. at ¶ 13.k.]

In the Pa Honua III neighborhood, in 2005, soil testing confirmed that chlordane was present in amounts exceeding the 2002 EPA PRG. The Navy hired Mr. Waldron to conduct a risk assessment for chlordane and other OCPs. Soil samples were collected from areas that were expected to have the highest concentrations of chlordane, as well as from other areas. [Id. at ¶¶ 13.l-m.]

Chlordane, Heptachlor and Heptachlor Epoxide were
found in the soils.  Potential health risks from
exposure to these pesticides were estimated for
residents, construction workers, maintenance
workers, and utility workers.  The majority of
the health risks were well within the EPA's
acceptable risk range, but there were a few risks
that fell in the acceptable range that
nevertheless required further evaluation.  After
reviewing the planned use of the site and all of
the results, certain soil was removed and placed
under a concrete basketball court so it could not
be disturbed, and thus eliminated risks to Pa
Honua III's residents, their guests, and workers.
Before these measures were implemented, the Navy
provided a site visit, briefings, and documents
to the Hawaii Department of Health. . . .

[Id. at ¶ 13.n.]  Post-construction soil testing was conducted

in 2007 on samples from each of the 106 buildings in the

neighborhood.  The samples were grouped into ten decision units,

and no pesticides were found in excess of the Tier 2 EALs in any

of the decision units.  [Id. at ¶ 13.o (citing Waldron Decl.,

Exh. 26 (Phase 2 Envtl. Site Assessment, Pa Honua 3 Marine Corps

Base Hawaii Family Housing Area, by Parsons, dated 10/1/07 ("Pa

Honua III Phase II ESA")).]  Mr. Poma also states the Pa

Honua III Phase II ESA shows that "no pesticide compounds

exceeded their respective Tier 2 EALs in any of the decision

units.  For Aldrin, Dieldrin, and Chlordane, that would mean the

detected concentrations are below today's Tier 1 EAL levels."

[Poma Decl. at ¶ 11.k.]

In the Kapoho neighborhood, a Phase I ESA and a

Phase II ESA were conducted, and Mr. Poma reviewed these and

other materials in the course of his work with Ohana. [Id. at ¶ 11.e.] "[A]ll pesticide compounds were below their respective Tier 1 and Tier 2 environmental action levels ('EALs') in all samples." [Id. (footnotes omitted).]

A Phase II ESA was also conducted for the Mololani neighborhood before the prior residences were demolished. [Id. at ¶ 11.g; Poma Decl., Exh. 7 (Mololani Phase II ESA).] Some homes in Mololani "tested positive for [OCPs, in particular aldrin, dieldrin, and chlordane,] above Tier 2 EALs, but many had no Tier exceedances." [Poma Decl. at ¶ 11.g & n.8.] However, all of those results were at levels which are now at or below the current Tier 1 EALs. [Id. at ¶ 11.g.]

> [A]s part of the redevelopment process for Mololani, the soil beneath and within two feet of the slabs of every pre-existing home was excavated to a depth of two feet below ground surface and was replaced with clean fill (or, in a few cases, left in place and covered with at least two feet of clean fill). The excavated soil was then buried on-site in carefully tracked pits and was covered with at least two feet of clean soil. . . . The soil removal and replacement process was carefully tracked in a soil closure report[.]

[Id.]

For the Ulupau neighborhood, a Phase II ESA was also conducted prior to demolition of the existing residences. [Id. at ¶ 11.l; Poma Decl., Exh. 10 (Ulupau Phase II ESA).] Another Phase II ESA was conducted by Integral Consulting in November

2011. [Poma Decl. at ¶ 11.l.] "[T]he majority of the homes and carports tested positive for [OCPs] above Tier 2 EALs (usually aldrin or dieldrin), but one had no Tier 2 exceedances." [Id.] Mr. Poma points out that "many" of these results would now be under the current Tier 1 EALs. [Id.]

> [A]s part of the redevelopment process for Ulupau, the soil beneath and within two feet of the slabs of **every pre-existing home and carport** was excavated to a depth of four feet below ground surface, and clean fill was used to replace the soil removed from beneath and around the slabs. In some instances, soil was left in place and covered with a minimum of two feet of clean soil. The excavated soil was then buried on-site in carefully tracked pits, and was covered with at least two feet of clean soil. . . . The soil removal and replacement process was carefully tracked in a soil closure report[.]

[Id. (emphasis in original).]

For the Waikulu neighborhood, before demolition, a Phase II ESA was conducted in each of the three prior neighborhoods that comprise what is now Waikulu. [Id. at ¶ 11.m; Poma Decl., Exh. 13 (Manning Court Phase II ESA), Exh. 14 (Rainbow Phase II ESA), Exh. 15 (NCO Row Phase II ESA).] Manning Court had no results above the Tier 1 EALs. [Poma Decl. at ¶ 11.m.] "In Rainbow Court and NCO Row, some of the homes tested positive for [OCPs] above Tier 2 environmental action levels, but some homes had no Tier 2 exceedances." [Id.]

Mr. Poma Mr. Poma points out that "many" of these results would now be under the current Tier 1 EALs.  [Id.]

> [A]s part of the redevelopment process for
> Waikulu, the soil beneath and within two feet of
> the slabs of **every pre-existing home** in Rainbow
> Court and NCO Row was excavated to a depth of two
> feet below ground surface.  Clean fill was used
> to replace the soil removed from beneath and
> around the slabs.  The excavated soil was then
> buried on-site in carefully tracked pits, and was
> covered with at least two feet of clean soil.
> The soil removal and replacement process was
> carefully tracked in a soil closure report[.]

[Id. (emphasis in original).]

The Heleloa neighborhood "is the only remaining historic family housing neighborhood on MCBH."  [Id. at ¶ 11.c.] When it was renovated in 2009, "a very careful historic preservation process was used."  [Id.]  Mr. Poma opines generally that:

> The results of th[e OCP] testing were consistent
> with the conceptual site model of historic use of
> organo-chlorinated pesticides to control
> termites, using procedures consisting of applying
> the termiticides to the ground surface prior to
> slab construction and then subsequently around
> the immediate edge of the foundation.  To the
> extent that residual pesticides were found, the
> maximum pesticide concentrations were found under
> the existing concrete foundations with
> concentrations decreasing rapidly with distance
> from the slabs.

[Id. at ¶ 46.]

## 4.  Testing During this Litigation

In 2017, ACSI conducted a soil analysis project at MCBH.  Before the testing, ACSI prepared a Sampling and Analysis Plan ("SAP"), which was approved by HDOH.  [Poma Decl. at ¶¶ 12-13; Whattoff Decl. 1, Exh. 46 (4/13/17 letter to Gregory Rapp, Ohana's Regional Vice President, from Eric Sadoyama, Remedial Project Manager, HDOH, HEER Office).]  Mr. Poma states:

> For all soil samples collected under the scope of this project, organo-chlorinated pesticides were either not detected at laboratory method detection limits or were reported at concentrations below applicable EALs.  Where detected, all concentrations of organo-chlorinated pesticides were below Hawai`i Department of Health's Tier I EALs.  These findings confirm that Ohana and U.S. Government soil management practices successfully eliminated risks to human health and the environment from organo-chlorinated pesticides in soils in the neighborhoods studied.

[Poma Decl. at ¶ 14.]  Mr. Poma oversaw and participated in the drafting of ASCI's Confirmation Soil Sampling Summary Report, dated December 2018 ("Confirmation Report").  [Id. at ¶ 15 & Exh. 18 (Confirmation Report).]  The neighborhoods studied in this project were Kaluapuni, Mokapu Court, Mololani, Pa Honua I, Pa Honua II, Ulupau, and Waikulu.[11]  [Poma Decl., Exh. 18 (Confirmation Report) at pg. 1-1.]

---

[11] The Hana Like, Hawaii Loa, and Nani Ulupau neighborhoods, referred to in the Confirmation Report as "Category 3," were not tested because the homes there were built after the OCPs at

(. . . continued)

Mr. Waldron has reviewed the Confirmation Report. [Waldron Decl. at ¶ 14.]  He states: "All of the samples from the 2017 testing were below Hawaii Department of Health Tier I EALs.  These findings confirm that [Ohana] and U.S. Government soil management practices successfully eliminated risks to human health and the environment from [OCPs] in the neighborhoods tested."  [Id. at ¶ 15.]

Thus, Defendants argue that, since the demolition of the prior Kaluapuni homes, there has been no evidence of OCPs exceeding Tier 1 EALs.  [Motion 1 CSOF at ¶ 11.]  They also argue that, for the Mokapu Court neighborhood, there has never been evidence of OCPs and, for the Pa Honua I and Pa Honua II neighborhoods, there has never been evidence of OCPs exceeding Tier 1 EALs.  [Id. at ¶¶ 12-14.]

Plaintiffs argue the 2017 testing, which Defendants contend shows no contamination, actually shows Ohana put

_____

issue were no longer available and, "[t]herefore, there is no basis to expect the potential of OCP termiticides in these neighborhoods or areas."  [Poma Decl., Exh. 18 (Confirmation Report) at pg. 1-1.]  The Heleloa, Kapoho, and Pa Honua III neighborhoods, referred to in the Confirmation Report as "Category 4," were not tested because, "[s]ince housing in the Heleloa neighborhood was built during the period when OCP termiticides were available for use, OCPs are assumed to be present in soil beneath these homes due to past termiticide application and are being managed in-place with institutional controls," and "[a]t Kapoho and Pa Honua 3, surface soils have already been checked and been determined not to contain OCPs at levels exceeding HDOH EALs in previous sampling events."  [Id.]

pesticide-contaminated soils in MCBH common areas.  [Opp. 1 at
8-10 & n.27 (citing Smith Decl. 1, Exh. 6 (excerpt of
Waikulu/Hana Like Site Report) at OHANA-FCRM010723).]
Plaintiffs argue the results from the Waikulu/Hana Like Site
Report exceed the Tier 1 EALs in the 2007 PSMP, "and are only
slightly below current Tier 2 levels of 5.4 mg/kg in some
instances."  [Id. at 10 & n.28 (citing Waikulu/Hana Like Site
Report at OHANA-FCRM010723).]  Mr. Poma testified:

> Q.    So then if you follow the plan 100
> percent and clean soil is then spread throughout
> the silent, why do we have detections of
> pesticide contamination following the most recent
> testing?
>
> A.    Which most recent testing?
>
> Q.    The 2017 testing where you have
> detections of pesticides in the clean soil that
> was used to cover these different neighborhoods.
>
> A.    They are at very residual levels, very
> low levels during –
>
> .  .  .  .
>
> A.    I guess I would say during the
> construction that was occurring, there's some
> opportunity for some co-mingling of some low
> levels of things that may have ended up in
> surface soils or something.  But –
>
> Q.    So there is an opportunity that
> mistakes could have happened?  That's what it
> would be, if there was co-mingling, that would be
> a mistake?
>
> A.    Not necessarily a mistake.
>
> Q.    That would be intended by the plan –

A.   Not intended.

[Smith Decl. 1, Exh. 2 (Poma Depo.) at 205-06.]  Plaintiffs

argue Mr. Poma admitted that Ohana's purported remediation

efforts actually spread OCP-contaminated soil and that Ohana did

not follow the 2007 PSMP.  [Opp. 1 at 10.]

Defendants have submitted evidence that, in January

2018, Mololani and Pa Honua soils were tested prior to the

installation of four new playgrounds, and OCPS "'were either not

detected at laboratory listed soil method detection limits or

below corresponding HDOH Tier 1 EALs.'"  [Poma Decl. at ¶ 11.g

(quoting Poma Decl., Exh. 28 (ACSI's report regarding Jan. 2018

testing)).]

### 5.   **Plaintiffs' Homes**

Kenneth Lake and Crystal Lake's ("the Lakes") home in

Mololani was rebuilt shortly before they moved in.  When the

Mololani Phase II ESA was conducted in 2007, the site of the

Lakes' home and the sites of the adjacent homes were not tested

for OCPs.  Of the three homes closest to the Lakes' home that

were tested, one had a Tier 2 EAL exceedance for dieldrin, but

the other homes had no Tier 2 exceedances.  [Id. at ¶¶ 16-17

(citing Poma Decl., Exh. 7 (Mololani Phase II ESA) at Figure 3

(OHANA-FCRM08211)).]  However, based on the current EALs, that

result would be below the Tier 1 EAL.  [Id. at ¶ 17.]  During

the Mololani redevelopment (*i.e.*, before the Lakes lived there),
the soil at all of the home sites was addressed.  [<u>Id.</u> at ¶ 18.]
For the site that became the Lakes' home, "196 cubic yards of
soil . . . were removed and replaced with clean soil or locally
sourced non-expansive fill."  [<u>Id.</u> (citing Poma Decl., Exh. 8
(Pesticide Soil Activity Closure Report for Mololani Family
Housing – Phase IV, by ACSI, dated November 2012) at OHANA-
FCRM000192).]  The soil around the Lakes' home site was tested
during the 2017 testing, <u>see</u> *supra* Background section I.C.4,
which showed no unsafe OCP levels.  [Poma Decl. at ¶ 19 (citing
Poma Decl., Exh. 18 (Confirmation Report) at OHANA-FCRM
015314).]

The site of the Beans' home in Pa Honua II was tested
during the 2017 testing.  [<u>Id.</u> at ¶ 21 (citing Confirmation
Report at OHANA-FCRM 015248).]  The Beans subsequently lived in
Hawaii Loa, which was built on undeveloped land after the OCP-
ban.  Mr. Poma therefore opines that Hawaii Loa was never
treated with OCPs.  [<u>Id.</u> at ¶ 22.]  The Wilsons also lived in
Hawaii Loa.  [<u>Id.</u> at ¶ 32.]

The site of Kyle Pahona's home in Ulupau was
redeveloped shortly before he moved there, and the soil for each
Ulupau home site was addressed during the redevelopment.  [<u>Id.</u>
at ¶¶ 23-24.]

> With respect to Mr. Pahona's specific home site,
> 348 cubic yards of soil were removed from B2671
> on June 16, 2011 and taken to the Area 1 PIS Pit.
> See Ex. 11 at OHANA-FCRM 000213.  Twelve days
> later, on June 28, 2011, 156 cubic yards of soil
> were removed from G2670 and taken to the Area 4
> PIS Pit.  See id. at OHANA-FCRM 000219.  All of
> this soil was replaced with clean soil.

[Id. at ¶ 24.]  The soil around Kyle Pahona's home site was tested during the 2017 testing, which showed no unsafe OCP levels.  [Id. at ¶ 25 (citing Poma Decl., Exh. 18 (Confirmation Report) at OHANA-FCRM 015233).]

The Moseleys' first home in MCBH was one of the original Mololani homes built in 1960.  That specific site was not tested before redevelopment.  Some homes nearby had no Tier 1 EAL or Tier 2 EAL exceedances, but other nearby homes had Tier 2 exceedances for dieldrin and chlordane.  [Id. at ¶ 26 (citing Poma Decl., Exh. 7 (Mololani Phase II ESA) at Figure 4 (OHANA-FCRM008212)).]  However, Mr. Poma states those results were so low that they would now be below the current Tier 1 EALs.  [Id.]  The Moseleys later lived in the Waikulu neighborhood, and that home site was redeveloped before they moved there.  [Id. at ¶ 27.]  The Moseleys' home site previously had one of two buildings, neither of which was tested when the Phase II ESA was performed.  [Id. (some citations omitted) (citing Poma Decl., Exh. 14 (Rainbow Phase II ESA) at Figure 2 (OHANA-FCRM 006419)).]  Some samples taken from other parts of

what became the Waikulu neighborhood were between the Tier 1 and Tier 2 EALs, while other samples were below the Tier 1 EALs. [Id. (some citations omitted) (citing Rainbow Phase II ESA at Figures 4-7 (Ohana-FCRM 006421-6424)).] "With respect to the Moseleys' specific home site, 363.5 cubic yards of soil were removed and replaced from around building 2578, and 316.3 cubic yards of soil were removed and replaced from around building 2579. All of this soil was replaced with clean soil." [Id. at ¶ 28 (citing Poma Decl., Exh. 16 (Pesticide Soil Activity Closure Report for Waikulu Family Housing - Increment 2, by Ohana, dated 10/26/10) at (OHANA-FCRM000326)).] The soil around the Moseleys' Waikulu home site was tested during the 2017 testing, which showed no unsafe OCP levels. [Id. at ¶ 29 (citing Poma Decl., Exh. 18 (Confirmation Report) at OHANA-FCRM 015141).] Finally, the Moseleys lived in the Pa Honua II neighborhood. [Id. at ¶ 30.] The soil around their Pa Honua II home site was tested during the 2017 testing, which showed no unsafe OCP levels. [Id. at ¶ 31 (citing Confirmation Report at OHANA-FCRM 015229).]

### 6. Plaintiffs' Testimony about OCPs

Harold Bean testified that, just because the Hawaii Loa neighborhood was built on undeveloped land after chlordane was banned does not mean chlordane is not present there, and he disputes the statement that it is "highly unlikely" OCPs were

used in the soil near those homes. [Whattoff Decl. 1, Exh. 47 (excerpts of trans. of 4/9/19 depo. of Harold Alan Bean, Jr. ("H. Bean Depo.")) at 80-81.] Harold Bean stated, "[t]here's no proof" that OCPs were never used in Hawaii Loa, and "there is nothing proving that it was not used in that area during the time frame that chlordane could have been used." Id. at 81-82; see also id. at 84. Even though Hawaii Loa was built on undeveloped land, "the fact that [chlordane] was used in other locations on base, [he] would have to assume that it was used there as well." [Whattoff Decl. 1, Exh. 47 (H. Bean Depo.) at 82.] Melinda Bean was asked whether she was "aware of any research or evidence that suggested that exposure . . . to residual amounts [of pesticides] in soils around homes can cause health issues," and she responded that she was not. [Whattoff Decl. 1, Exh. 48 (excerpts of trans. of 4/9/19 depo. of Melinda Bean ("M. Bean Depo.")) at 8.]

Crystal Lake testified that she could not identify any evidence showing the area where she lived in MCBH was impacted by pesticides, or any other hazardous substances. [Whattoff Decl., Exh. 49 (excerpts of trans. of 4/27/19 depo. of Crystal Lake ("C. Lake Depo.")) at 8-9.] She asserts her injury is that she "was not told about the construction and the soil that was being dug up on that base and the possibility of it containing harmful products," but she could not identify what harmful

products were in the soil. [Id. at 22-23.] She testified that, when Defendants informed residents about how soil that was potentially impacted with pesticides was addressed, Defendants should have provided citations or evidence "for [her] to refer to fact check" and confirm the remediation described had actually been done. [Id. at 50-51.] Kenneth Lake gave similar testimony about what Defendants should have provided. [Whattoff Decl. 1, Exh. 50 (excerpts of trans. of 3/11/19 depo. of Kenneth Lake ("K. Lake Depo.")) at 59-60.] Kenneth Lake testified that he "believe[d] after the mold issue was taken care of, then [his MCBH home] was a safe place to live." [Id. at 65.]

Ashley Moseley testified that she "can't say for sure, but [she has] reason to believe that [she] was" exposed to OCPs because OCPs were used on MCBH homes and, when Ohana was "demolishing them, obviously it was in the air and we were exposed to it since it can live in the ground for, like, twenty years." [Whattoff Decl. 1, Exh. 51 (excerpts of trans. of 4/17/19 depo. of Ashley Moseley ("A. Moseley Depo.")) at 8.] She admitted that, other than the prior use of OCPs at MCBH and the construction, she had no basis for her statement that she was exposed to OCPs. [Id. at 8-9.] She admitted she did not know whether the soil around her home was impacted by pesticides during the time she lived there. [Id. at 91.] Timothy Moseley

31

testified that his specific homes on MCBH had OCPs in the soil around them. He stated the basis for his statement was the maps and documents showing that OCPs were used on MCBH in general. [Whattoff Decl. 1, Exh. 52 (excerpts of trans. of 4/16/19 depo. of Timothy Moseley ("T. Moseley Depo.")) at 16, 19.] Timothy Moseley testified that, other than his homes, he was exposed to OCPs in "[c]ommon areas, playgrounds, commissary, going to work, other peoples' houses, and school," but he could not identify any specific document or evidence showing this. [Id. at 21.] He testified the he did not have any evidence showing the reported soil remediation was not done, but there is also no evidence showing that the remediation was done. [Id. at 105.]

Kyle Pahona testified that he had no evidence his MCBH home was impacted by OCPs or any other hazardous substances. Further, when he lived at MCBH, he was not aware that he had any exposure to OCPs in ways other than at his home. [Whattoff Decl. 1, Exh. 53 (excerpts of trans. of 4/27/19 depo. of Kyle Pahona ("Pahona Depo.")) at 5-6.] He also acknowledged he had no evidence that the reported soil remediation in his neighborhood did not occur. [Id. at 44.]

Heather Wilson testified that she did not know whether there were OCPs in the Hawaii Loa neighborhood when she lived there, and she was not aware of any evidence that OCPs were ever present in the soil in Hawaii Loa. [Whattoff Decl. 1, Exh. 54

32

(excerpts of trans. of 3/5/19 depo. of Heather Wilson ("H. Wilson Depo.")) at 40, 52.] She stated she was not aware that OCPs were ever used in the soil around the home where she lived but, if they were used, Forest City should have told Plaintiffs about it before they signed their lease. [Id. at 49.] Ryan Wilson testified that he was not aware of any evidence that OCPs were applied to their homes, or any of the other homes in their neighborhood. [Whattoff Decl. 1, Exh. 55 (excerpts of trans. of 3/5/19 depo. of Ryan Wilson ("R. Wilson Depo.")) at 62-64.]

In response to many of defense counsel's questions, Plaintiffs responded that they could not answer because they were not experts, environmentalists, or scientists. See, e.g., Whattoff Decl. 1, Exh. 47 (H. Bean Depo.) at 81; Exh. 48 (M. Bean Depo.) at 48; Exh. 49 (C. Lake Depo.) at 6; Exh. 50 (K. Lake Depo.) at 60, 115-16; Exh. 52 (T. Mosely Depo.) at 97, 109; Exh. 53 (Pahona Depo.) at 43; Exh. 54 (H. Wilson Depo.) at 49, 57; Exh. 55 (R. Wilson Depo.) at 73-74.

Thus, Defendants argue Plaintiffs have no evidence that the homes they lived in were impacted by OCPs while they lived there. [Motion 1 CSOF at ¶¶ 25-28 (citing pages of Pltfs.' deposition transcripts).] Further, Defendants emphasize that Plaintiffs could not identify any other specific areas

where they were exposed to OCPs.  [Id. at ¶ 30 (citing pages of Pltfs.' deposition transcripts).]

### D.   **Dust at MCBH**

Harold Bean testified that the only evidence showing that the dust he experienced was caused by construction was that he saw construction going on, including the movement of soil with equipment.  [Whattoff Decl. 1, Exh. 47 (H. Bean Depo.) at 77.]  His only basis for his belief that the dust was impacted by OCPs was the fact that OCPs were used at MCBH at some point.  [Id. at 124-26.]  Melinda Bean acknowledged she had no evidence the construction dust contained pesticides.  [Whattoff Decl. 1, Exh. 48 (M. Bean Depo.) at 74.]

Kenneth Lake testified that he could not recall whether the level of dust in his home was affected when construction was occurring.  [Id., Exh. 50 (K. Lake Depo.) at 85.]  He also testified that he did not know what the source of the dust was.  [Id. at 88-89.]

Ashley Moseley believed the dust that affected her home had OCPs because she assumed that that residual OCPs in the MCBH soil would become airborne during construction.  However, she admitted that she did not know what levels, if any, of OCPs there were in the dust.  [Whattoff Decl., Exh. 51 (A. Moseley Depo.) at 9.]

Kyle Pahona testified that he never took pictures of the dust because there was "[f]ar less dust [at MCBH] than there would be in Arizona[, where he is from,] so [he] lived with it," and he did not think there was anything unusual about the dust at MCBH.  [Whattoff Decl., Exh. 53 (Pahona Depo.) at 48-49.]  He stated construction dust, or any other dust at MCBH, did not impact his life.  [Id. at 51.]

Heather Wilson testified that she did not know whether the construction dust at MCBH had unsafe levels of pesticide.  [Whattoff Decl. 1, Exh. 54 (H. Wilson Depo.) at 41.]  Ryan Wilson testified that he did not know whether the dust that impacted his home was from construction at MCBH or from other areas with exposed dirt, and he could not say whether he continued to experience dust after the construction was completed.  [Id., Exh. 55 (R. Wilson Depo.) at 103-04, 106.]

Defendants argue an expert is required to determine the source of dust.  [Motion 1 CSOF at ¶ 34.]  Defendants' expert stated:

> To the extent that fugitive dust was generated during the construction-related activities, there is no evidence that it contained the chemicals used historically as termiticides for older housing stock at MCBH.  The soil sampling conducted at MCBH demonstrates that pesticide-impacted soils were highly localized to areas beneath and adjacent to the foundations of the older homes.  The PSMP established a number of procedures to minimize the potential for fugitive dust emissions while handling pesticide-impacted

soils. In addition, buildings suspected of
containing hazardous materials, such as asbestos,
were inspected and abated prior to initiating
demolition activities.

[Whattoff Decl. 1, Exh. 58 (Expert Report by James F. Lape, Jr.,

dated 5/22/19 ("Lape Report")) at § 4.2.[12]] As to Plaintiffs'

allegations in this case, Mr. Lape opines:

Some of the most critical steps in the exposure
assessment paradigm described above were missing
from the complaint. For example, there is no
characterization of the chemical-specific
concentration at the point of exposure for any
potential exposure route. Moreover, there is no
characterization of the frequency and duration of
the exposures by a potential receptor[.]

It is my opinion that the chemical-specific
impacts of potential exposures cannot be
expressed with a reasonable scientific certainty
without a more comprehensive exposure assessment.

[Id. at § 4.2.3.]

Defendants also presented testimony about the measures

Ohana took to remove, prior to construction, soil that was

potentially impacted with OCPs. [Poma Decl. at ¶¶ 50-54, 56-57,

59.] Mr. Poma acknowledges receiving one complaint about a soil

stockpile in the Mololani neighborhood, but he states the

_____

[12] Mr. Lape is "an atmospheric and physical scientist with
more 30 years of experience in the health risk assessment and
environmental science fields," and his "expertise is in the area
of air toxics fate and transport modeling and exposure
assessment." [Lape Report at § 1.1.]

36

stockpile was clean soil that was intended for groundcover.
[Id. at ¶ 59 n.18.]

E.   **Damages**

Plaintiffs seek all or part of their Basic Housing
Allowance ("BAH") for the time they lived at MCBH. [Motion 2
CSOF at ¶ 1; Concise statement of facts in supp. of Opp. 2
("Opp. 2 CSOF"), filed 7/1/19 (dkt. no. 167), at ¶ 1 (stating
Defs.' ¶ 1 is undisputed).] Plaintiffs paid the following
amounts in rent while living at MCBH:

| Plaintiffs | Amount of Rent |
|------------|----------------|
| Lakes | $153,000.00 |
| Beans | $153,000.00 |
| Kyle Pahona | $103,605.60 |
| Moseleys | $104,281.00 |
| Wilsons | $253,140.60 |

[Motion 2 CSOF at ¶ 2; Opp. 2 CSOF at ¶ 2.] Plaintiffs have
testified that they would not have lived at MCBH had they been
told about the OCPs. See, e.g., Opp. 2 CSOF, Decl. of
Kyle Smith ("Smith Decl. 2"), Exh. 2 (Pahona Depo.) at 40:7-18.

The Lakes and Ashley Moseley seek general damages for
emotional distress; the Beans, Timothy Moseley, and Kyle Pahona
seek general damages for interference with their use and
enjoyment of their home and community. [Motion 2 CSOF at ¶¶ 3-
4; Opp. 2 CSOF at ¶¶ 3-4.]

There has been some testimony about medical issues,
such as Kenneth Lake's low testosterone levels, Harold Bean's

asthma, Ryan Wilson's asthma and sinus problems, and the Moseley

children's autism. [Motion 2 CSOF at ¶¶ 5-8; Opp. 2 CSOF at

¶¶ 5-8.] However, as to each of these, Plaintiffs state they

"do not seek damages for illness." [Opp. 2 CSOF at ¶¶ 5-8.]

Plaintiffs acknowledge they have not identified their doctors or

other medical care providers as potential witnesses, and they

state they do not intend to rely on medical testimony.

Similarly, they acknowledge they have not disclosed any experts,

but they argue none of their claims require expert testimony.

[Motion 2 CSOF at ¶¶ 9-10; Opp. 2 CSOF at ¶¶ 9-10.]

In 2014, Kyle Pahona first heard about MCBH's prior

use of OCPs, but he did not move off of MCBH until November 30,

2016, when he was transferred. [Motion 2 CSOF at ¶ 19; Opp. 2

CSOF at ¶ 19.] Heather Wilson and Crystal Lake also first heard

about OCPs in 2014, but the Wilsons did not consider moving off

of MCBH because of Ryan Wilson's impending retirement, and the

Lakes did not move off base until Kenneth Lake took a civilian

job. [Motion 2 CSOF at ¶¶ 20-21; Opp. 2 CSOF at ¶¶ 20-21.] The

MCBH lease agreement states it is terminable at will. [Motion 2

CSOF at ¶ 22; Opp. 2 CSOF at ¶ 22 (admitting Defs.' ¶ 22 in

part).] Ashley Moseley states the first MCBH home they rented

had significant dust issues, and they moved off of the base in

2009. However, the Moseleys later moved back to MCBH and lived

there for several more years. Those homes did not have

significant dust impacts.  [Motion 2 CSOF at ¶ 23; Opp. 2 CSOF at ¶ 23.]

## II.  **Motions**

In Motion 1, Defendants argue they are entitled to summary judgment as to each of the remaining counts because: 1) Plaintiffs ultimately will be unable to prove they were exposed to unsafe levels of pesticides, or any other substance; and 2) this is a necessary element of each of Plaintiffs' claims and.  Defendant asserts that, because Plaintiffs have failed to present sufficient evidence to raise a genuine issue of fact as to this element, all of Plaintiffs' claims fail as a matter of law.

In Motion 2, Defendants argue they are entitled to summary judgment on all of Plaintiffs' remaining claims because Plaintiffs are unable to prove any damages.  In the alternative, Defendants seek a ruling excluding certain theories of Plaintiffs' damages.  According to Defendants, Plaintiffs' damages theories are: 1) they are entitled to the return of all of the rent they paid while living at MCBH; 2) in the alternative, they should be awarded the difference between the rent they paid and the rent they would have paid if the presence of OCPs on MCBH had been disclosed; and 3) they are entitled to general damages and emotional distress damages.

**DISCUSSION**

I.   **Motion 1**

    A.   **Safe and Habitable Housing**

        In order to ultimately prevail on Counts I, II, and III, Plaintiffs must prove that Ohana, as to Counts I and II, and Defendants, as to Count III, failed to provide safe and habitable housing to Plaintiffs.  See First Amended Complaint at ¶¶ 62, 63.b, 63.c (alleging Ohana breached its lease agreements with Plaintiffs by failing to provide safe and habitable housing and a safe and inhabitable community at MCBH); 5/31/18 Order, 2018 WL 2449188, at *6 ("A property owner breaches the implied warranty of habitability if he leases his property with a defect or unsafe condition that is of a nature and kind which will render the premises unsafe, or unsanitary and thus unfit for living." (citations and internal quotation marks omitted)); id. (ruling Plaintiffs' allegation that Defendants violated Haw. Rev. Stat. § 521-10 is actionable pursuant to Haw. Rev. Stat. § 521-63).[13]  Plaintiffs' position that they are not required to prove they were exposed to OCPs is rejected.

---

    [13] Section 521-10 states: "Every duty imposed by this chapter and every act which must be performed as a condition precedent to the exercise of a right or remedy under this chapter imposes an obligation of good faith in its performance or enforcement."  Section 521-63 states, in pertinent part:

(. . . continued)

## 1. __Scope of Plaintiffs' Claims__

Count I alleges that Ohana agreed to provide safe and habitable conditions both at Plaintiffs' homes and in the MCBH community generally.  See 5/31/18 Order, 2018 WL 2449188, at *5. Plaintiffs' MCBH leases indicate that Ohana contemplated offering various community services and facilities for residents' use throughout MCBH, in connection the leases of their homes.  See, e.g., Whattoff Decl. 2, Exh. T (Pahona Lease) at OHANA-FCRM 016507 ("Owner may provide from time to time various services, equipment and facilities for residents to use at their own risk. . . .  Resident recognizes that Owner provides these services and facilities for Residents only as a

_____

> (a)  If any condition within the premises deprives the tenant of a substantial part of the benefit and enjoyment of the tenant's bargain under the rental agreement, the tenant may notify the landlord in writing of the situation and, if the landlord does not remedy the situation within one week, terminate the rental agreement.  The notice need not be given when the condition renders the dwelling unit uninhabitable or poses an imminent threat to the health or safety of any occupant. . . .

> (b)  If the condition referred to in subsection (a) was caused wilfully or negligently by the landlord, the tenant may recover any damages sustained as a result of the condition.

Plaintiffs contend they were deprived of the benefit and enjoyment of their rental homes because the conditions at MCBH were not safe and habitable.  [Opp. 1 at 13-15.]

courtesy in connection with Resident's leasing of the Premises."); Smith Decl. 1, Exh. 8 (Community Handbook) at 7 (stating that "common areas[] include[e] but [are] not limited to parking lots, stairwells, breezeways, jogging trails, laundry rooms, courtyard areas, the grounds surrounding the Premises, clubrooms, sport courts, creeks, lakes and pools" and "are for the use and enjoyment of all Residents at the Neighborhood"); id. at 25 ("Playgrounds are provided throughout the Neighborhood for Resident, Occupant and Guest use and enjoyment."). Forest City, as Ohana's agent, was responsible for the ground maintenance for these community facilities. See, e.g., Smith Decl. 1, Exh. 8 (Community Handbook) at 13 ("RSO's will regularly mow and maintain all unfenced grounds around the Premises including common areas, community centers and playgrounds."); id. at 25 ("the playgrounds and common areas are cleaned and mowed on a schedule by the maintenance technicians").[14] For purposes of the instant Motions, the record must be viewed in the light most favorable to Plaintiffs, the nonmoving party, and all inferences must be drawn in Plaintiffs' favor. See S.R. Nehad v. Browder, 929 F.3d 1125, 1132 (9th Cir. 2019). Viewing Plaintiffs' leases and the Community Handbook in

_____

[14] "RSOs" refers to "Resident Services Offices," which are staffed by the Forest City "team." [Smith Decl. 1, Exh. 8 (Community Handbook) at 1.]

the light most favorable to Plaintiffs, it can be reasonably inferred that Defendants undertook the obligation to maintain the grounds underneath the community facilities in a safe condition.[15]

Plaintiffs have presented evidence that they and their children frequently traveled throughout the MCBH community for various activities, including going to school, visiting friends' houses, and playing at the playground. See, e.g., Smith Decl. 1, Exh. 11 (H. Wilson Depo.) at 68-69; id., Exh. 12 (Response & Objections to Def. Ohana Military Cmtys., LLC's First Request for Answers to Interrogs. to Pltf. Heather Wilson, dated 2/26/19) at response to interrog. no. 2. Therefore, in ruling on Motion 1, this Court must consider whether Plaintiffs were exposed to unsafe and uninhabitable conditions anywhere at MCBH, not only whether their specific homes at MCBH were safe and habitable.

## 2. **Lack of Expert Testimony**

In Motion 1, Defendants argue Plaintiffs have not raised a genuine issue of fact as to the issue of whether MCBH was unsafe and uninhabitable because Plaintiffs have not

---

[15] In contrast, Ohana expressly disclaimed "any warranties concerning the equipment or facilities," and MCBH residents agreed that "representations have not been made regarding the safety, desirability or quality of equipment or facilities." [Smith Decl. 1, Exh. 8 (Community Handbook) at 8.]

presented any expert testimony. Further, even if Counts I, II, and III proceed to trial, Plaintiffs will be unable to prove that issue without expert testimony. Plaintiffs contend they are not required to present expert testimony because the evidence Defendants have presented establishes the widespread presence of OCPs throughout MCBH and the risks that OCPs present. However, the only specific document that Plaintiffs mention is the PSMP, and, while Plaintiffs assert the "PSMP and related documentation confirms pesticide contamination, exposure estimates, cancer risks, and other relevant details for the MCBH community[,]" Plaintiffs do not identify any specific statement in the PSMP or in any other document. [Opp. 1 at 25.] Defendants have carried their initial burden on summary judgment, and Plaintiffs' general reliance on the PSMP and other unspecified documents does not raise a genuine issue of material fact as to Plaintiffs' claim that MCBH was unsafe and uninhabitable because of pesticide contamination in the soil. See Fed. R. Civ. P. 56(a) (stating a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").[16]

---

[16] This district court has stated: "The burden initially falls on the moving party to identify for the court those 'portions of the materials on file that it believes demonstrate

(. . . continued)

Regarding chlordane – the most commonly used OCP for

termite treatment in Hawai`i, the 2007 PSMP states:

> Most exposures to chlordane are through
> inhalation, ingestion or absorption through the
> skin.  The most common source is from ingesting
> chlordane-contaminated food.  Swallowing small
> amounts of chlordane or breathing air containing
> high concentrations of chlordane vapors can cause
> headaches, irritation, confusion, weakness, and
> vision problems.  Based on animal studies, the
> U.S. Environmental Protection Agency (USEPA) has
> determined that chlordane is a probable human
> carcinogen.  Exposure to high enough amounts can
> cause adverse effects to the liver.

[Poma Decl. 1, Exh. 23 (2007 PSMP) at 5.]  The 2007 PSMP makes

similar statements about aldrin and dieldrin.  [Id.]  The 2007

PSMP does not specify what amount of the OCPs must be ingested

or inhaled to produce adverse health effects.

As to the 2007 PSMP's target risk levels, see *supra*

Background section I.C.1 (quoting 2007 PSMP at 10), Plaintiffs

argue the PSMP unilaterally determined that it is acceptable to

expose MCBH residents to a 1 in 100,000 risk of cancer and other

---

the absence of any genuine issue of material fact.'"  Campbell
v. Dep't of Human Servs., 384 F. Supp. 3d 1209, 1216 (D. Hawai`i
2019) (citing T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), *appeal filed*, (9th
Cir. May 22, 2019).  Because Defendants have carried their
burden, Plaintiffs "must set forth specific facts showing that
there is a genuine issue for trial."  Id. (citing T.W. Elec.
Serv., 809 F.2d at 630).

non-cancer adverse health effects.[17]  [Opp. 1 at 6.]  However,
the 1 in 100,000 risk for Tier 2 EALs is consistent with the
guidance provided by various government environmental regulatory
offices.  [Poma Decl., Exh. 23 (2007 PSMP) at 11-12.]  The 2007
PSMP sets forth the processes for: dealing with pesticide-
impacted soils during demolition and construction; and on-going
operation and maintenance of housing areas with pesticide-
impacted soils.[18]  [Id. at 21-34.]  As previously noted, the
HDOH, HEER Office concurred in the 2007 PSMP.  The Concurrence
Letter specifically states: "This concurrence includes the use
of the proposed Tier 2 EALs (which incorporate cumulative risk
considerations for multiple contaminants) for project sites."
[Poma Decl., Exh. 27 (Concurrence Letter) at 1.]  Moreover, the
HDOH, HEER Office subsequently increased the thresholds for the
relevant Tier 1 EALs.  See Poma Decl. at ¶ 11.g & n.8 (citing
HDOH Tier 1 Documentation at Table B-1).  In raising the
thresholds, the HDOH stated: "A cancer risk of less than **one-in-**

_____

[17] Of the neighborhoods at issue in this action, the 2007
PSMP only analyzed Kapoho, Waikulu – Manning, Waikulu – NCO Row,
and Waikulu – Rainbow.  See Poma Decl., Exh. 23 (2007 PSMP) at
3, 16-17.  However, as previously noted, there is evidence that
Defendants considered the PSMP applicable to all MCBH
neighborhoods.

[18] The 2007 PSMP defines "pesticide-impacted soils" as
"soils with pesticide concentrations above the Tier 2 EALs."
[Poma Decl., Exh. 23 (2007 PSMP) at 21.]

**ten thousand** . . . is considered to be **insignificant** and not detectable in a population." [2017 HDOH Tier 1 Documentation at pg. 1-6 (emphases added).] The 2017 HDOH Tier 1 Documentation only states that the contaminant should be removed if the cancer risk is more than 1 in 10,000. [Id.]

In order to prevail on Counts I, II, and III, Plaintiffs must establish that, in spite of: 1) the regulatory bases for the 1 in 100,000 risk-level threshold; 2) the HEER concurrence; and 3) the HDOH's subsequent increase in the Tier 1 EALs, the 2007 PSMP permitted pesticide levels at MCBH which rendered MCBH unsafe and uninhabitable. In Barber, the district court stated:

> Expert testimony may be admissible if the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a); Pyramid Tech., Inc. v. Hartford Cas. Ins. Co., 752 F.3d 807, 813 (9th Cir. 2014).
>
> . . . .
>
> The Court must evaluate Hawaii state substantive law to determine if expert testimony is required. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78–80 (1938); see Pyramid Tech., Inc., 752 F.3d at 818.
>
> . . . .
>
> Under Hawaii law a plaintiff is only required to provide expert testimony to establish his prima facie case in limited circumstances.

> Expert testimony is not required in an
> ordinary negligence case. Hawaii law provides
> that in an ordinary negligence case, the jury can
> determine whether there has been a breach of
> defendant's duty to the plaintiff on the basis of
> their everyday experience, observations, and
> judgment. Exotics Hawaii-Kona, Inc. v. E.I.
> DuPont De Nemours & Co., [116 Hawai`i 227,] 172
> P.3d 1021, 1043-44 (Haw. 2007) (citing Bernard v.
> Char, [79 Hawai`i 371,] 903 P.2d 676, 682 (Haw.
> App. 1995)).

Barber v. Ohana Military Cmtys., LLC, Civil No. 14-00217 HG-KSC,
2015 WL 4171984, at *6 (D. Hawai`i July 9, 2015).[19] In the
instant case, the claims in Counts I, II, and III are more
complex than "ordinary negligence claims." The issue of whether
MCBH could be considered unsafe and uninhabitable, in spite of
the regulatory support for the positions taken in the 2007 PSMP,
requires knowledge that is beyond the "everyday experience,
observations, and judgment" of a jury. See Exotics Haw.-Kona,

---

[19] This Court agrees with the district court in Barber that,
under Hawai`i law, expert testimony is not required for a
plaintiff to establish an ordinary negligence claim. The
district court's discussion focused upon the Barber plaintiffs'
negligence claims. See 2015 WL 4171984, at *7 ("Here,
Plaintiffs' negligence causes of action do not require expert
testimony for Plaintiffs to establish a prima facie case."); id.
("One of the principal claims made by Plaintiffs in their
negligence causes of action is that Defendants breached their
duty to Plaintiffs when they failed to remediate the soil as
provided in their Pesticide Soils Management Plan."). This
Court, however, disagrees with, and declines to follow, the
district court's extension of its ruling that expert testimony
was not required for the Barber plaintiffs' negligence claims to
the Barber plaintiffs' claims that did not sound in negligence.
See id.

116 Hawai`i at 299-300, 172 P.3d at 1043-44.  An expert

witness's "scientific, technical, or other specialized

knowledge" is necessary to help the jury understand the evidence

and to determine whether MCBH was safe and habitable.  See

Rule 702(a).  Because Plaintiffs did not identify any expert

witnesses regarding soil contamination and remediation

standards, they cannot contest the positions in the 2007 PSMP,

or other similar documents, discussed *supra* Background sections

I.C.1-4, that Ohana: 1) identified areas within MCBH that

required remediation of contaminated soil; and 2) identified

appropriate remedial actions.

Arguments by Plaintiffs' counsel and testimony by

Plaintiffs attacking the assumptions and methodology in the 2007

PSMP and other similar documents do not constitute expert

testimony.  Nor is Plaintiffs' testimony admissible as lay

opinion because no plaintiff testified to a sufficient factual

basis that would support a finding that his or her opinions were

"rationally based on th[at] witness's perception" and were "not

based on scientific, technical, or other specialized knowledge

within the scope of Rule 702."  See Fed. R. Evid. 701(a), (c);

see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523

F.3d 1051, 1060 (9th Cir. 2008) (stating "a district court does

not abuse its discretion in allowing lay opinion testimony when

a witness cannot explain through factual testimony the

combination of circumstances that led him to formulate that opinion" (citation and internal quotation marks omitted)). Thus, Plaintiffs have failed to present any admissible evidence that raises a genuine issue of material fact as to the validity of the 2007 PSMP and other similar documents. See Weil v. Citizens Telcom Servs. Co., 922 F.3d 993, 998 (9th Cir. 2019) ("we may only consider admissible evidence when reviewing a motion for summary judgment").

### 3. **Alleged Failure to Comply**

Plaintiffs next argue the existing record raises a genuine issue of material fact regarding whether Defendants complied with the remediation efforts called for in the 2007 PSMP and other similar documents. Plaintiffs argue the Navy refuses to represent that the homes on MCBH are safe. [Opp. 1 at 18.] An email obtained in a Freedom of Information Act request during Barber states:

> there is some thought in the HQ MCIPAC legal
> community that we do not have a proper basis to
> include the first bullet of slide 4, as we have
> no "quantitative evidence" to say the homes are
> safe. Until this issue is resolved among "the
> lawyers," recommend the first bullet of slide 4
> not be used at our NOA briefs, and we go back to
> status quo on having Forest City make any
> representations on the safety of the quarters
> under their management.

[Smith Decl. 1 at ¶ 3, Exh. 10 (email dated 10/21/15, sender and recipients redacted).] Although this email arguably shows the

Navy declined to make a statement that MCBH homes were safe, the email also shows the Navy allowed Forest City to make such representations.  As previously noted, Forest City is Ohana's agent in Ohana's PPV with the Navy/Marines.  Thus, the email cannot be construed as disclaiming the safety and habitability of MCBH housing.  Even viewing the record in the light most favorable to Plaintiffs, this email does not raise a triable issue fact as to: 1) whether Defendants complied with the 2007 PSMP and other similar documents; or 2) whether MCBH was unsafe and uninhabitable due to unresolved soil contamination issues.

Plaintiffs also argue Mr. Poma admitted during his deposition that contaminated soil was co-mingled with clean soil during the remediation efforts.  See Smith Decl. 1, Exh. 2 (Poma Depo.) at 205-06, quoted supra Background section I.C.4.  During that line of questioning, Mr. Poma testified the levels of pesticides detected in the 2017 testing were at low, residual levels.  Even viewing the record in the light most favorable to Plaintiffs, this is not enough to raise a triable issue of fact as to whether Ohana complied with the 2007 PSMP and other similar documents.  Plaintiffs would have to present expert testimony to show that the residual levels of pesticides found in the 2017 testing show that Ohana failed to comply with the remediation procedures set forth in the 2007 PSMP and other similar documents.  Viewing the current record as a whole in the

51

light most favorable to Plaintiffs, it must be concluded that Plaintiffs have not presented any admissible evidence that Ohana failed to comply with the 2007 PSMP and other similar documents.

### 4. Ruling

There is undisputed evidence in the record that Ohana: 1) identified areas within MCBH that required remediation of contaminated soil; 2) identified appropriate remedial actions; and 3) implemented those remedial measures. Plaintiffs have failed to present sufficient evidence to raise a triable issue of fact as the issue of whether MCBH was safe and habitable. Summary judgment is therefore granted in favor of: Ohana as to the portion of Count I alleging Ohana breached the Plaintiffs' leases by failing to provide safe and habitable living conditions on MCBH; Ohana as to Count II; and Defendants as to Count III.

In addition, Count I also alleges Ohana breached its lease agreements with Plaintiffs by failing to "fully implement" the PSMP. [First Amended Complaint at ¶ 63.d.] Because Plaintiffs have failed to present sufficient evidence to raise a triable issue of fact as to the alleged failure to comply with the 2007 PSMP, or any other applicable version, Ohana is entitled to summary judgment as to that portion of Count I.

**B.   Failure to Warn**

The remaining portion of Count I alleges Ohana breached Plaintiffs' lease agreements by failing to "[d]isclose the presence, nature, or extent of pesticide-contaminated soils at MCBH." [Id. at ¶ 63.a.]  In addition, Count V alleges Defendants negligently failed to warn Plaintiffs about the risks presented by the pesticide-contaminated soils at MCBH.  [Id. at ¶¶ 96-97.]

**1.   Breach of Contract**

As previously noted, the Community Handbook, which is incorporated into Plaintiffs' lease agreements, contains a disclosure about the prior use of now-banned pesticides.  [Smith Decl. 1, Exh. 8 (Community Handbook) at 12, quoted *supra* Background section I.B.]  The disclosure states such pesticides "may be found in soils under and around housing constructed in both civilian and military communities." [Id.]  Plaintiffs have not identified any specific term in their lease agreements that obligated Ohana to make a more detailed disclosure about the possibility of residual pesticides in the soil at MCBH.  See 5/31/18 Order, 2018 WL 2449188, at *5 (stating one of the elements of a breach of contract claim is the identification of the specific provision that the defendant allegedly violated).  Plaintiffs appear to argue that this portion of Count I alleges

a breach of the covenant of good faith and fair dealing, which is implied in their lease agreements.  <u>See</u> Opp. 1 at 14.

None of the allegations in Count I refer to a breach of the implied covenant of good faith and fair dealing.  <u>See</u> First Amended Complaint at ¶¶ 59-67.  However, even if Plaintiffs are allowed to pursue a breach of contract claim that is not plead in the First Amended Complaint, the claim would still fail as a matter of law.  "Under Hawai`i law, 'every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement.'"  <u>Liberty Mut. Ins. Co. v. Sumo-Nan LLC</u>, CIVIL NO. 14-00520 DKW-KSC, 2015 WL 6755212, at *3 (D. Hawai`i Nov. 4, 2015) (quoting <u>Best Place, Inc. v. Penn Am. Ins. Co.</u>, 82 Hawai`i 120, 123-24, 920 P.2d 334, 337-38 (1996)).  In Plaintiffs' lease agreements, Ohana agreed to provide safe and habitable conditions at MCBH.  This Court has ruled that Ohana is entitled to summary judgment on Plaintiffs' claims asserting that Ohana failed to provide safe and habitable conditions.  It is therefore assumed that Plaintiffs were provided with safe and habitable conditions while they lived at MCBH.  Thus, Ohana's failure to disclose more information about the prior use of now-banned pesticides at MCBH did not deprive Plaintiffs of the benefits of their lease agreements.  Plaintiffs have failed to raise a triable issue of

fact as to their allegation that Ohana breached Plaintiffs'

lease agreements by failing to disclose more information about

potential pesticide-contamination in the soil at MCBH.

Defendants are therefore entitled to summary judgment as to that

portion of Count I.

### 2. **Negligent Failure to Warn**

In <u>Barber</u>, the district court stated:

> A successful negligence claim must satisfy
> the following four elements: (1) a duty, or
> obligation, recognized by the law, requiring the
> actor to conform to a certain standard of
> conduct, for the protection of others against
> unreasonable risks; (2) a failure on the actor's
> part to conform to the standard required; (3) a
> reasonably close causal connection between the
> conduct and the resulting injury; and (4) actual
> loss or damage resulting to the interests of
> another. <u>Ono v. Applegate</u>, 612 P.2d 533, 538
> (Haw. 1980).

> The Hawaii Intermediate Court of Appeals has
> explained that the duty to warn against unusual
> hazards has long been recognized as a source of
> tort liability. <u>Kajiya v. Dep't of Water Supply</u>,
> 629 P.2d 635, 639 (Haw. Ct. App. 1981) (internal
> citation omitted). Pursuant to Hawaii law, one
> who is in control of "what he knows or should
> know is a dangerous agency, which creates a
> foreseeable peril to persons or property that is
> not readily apparent to those endangered to the
> extent that it is reasonably possible, one owes a
> duty to warn them of such potential danger." <u>Id.</u>
> at 640.

<u>Barber v. Ohana Military Cmtys., LLC</u>, Civil No. 14-00217 HG-KSC,

2014 WL 3529766, at *9 (D. Hawai`i July 15, 2014). Because

Defendants have established that Ohana provided safe and

habitable conditions at MCBH, the potential presence of residual pesticides in the soil at MCBH was not "a dangerous agency[] which create[d] a foreseeable peril to" Plaintiffs. See Kajiya, 2 Haw. App. at 226, 629 P.2d at 640. Thus, Defendants did not have a duty to provide any further warnings to Plaintiffs beyond the pesticide disclosure contained in Plaintiffs' lease agreements. Defendants are therefore entitled to summary judgment as to Count V.

## C. Remaining Claims

### 1. Counts VI, VII, and VIII

Counts VI, VII, and VIII are also premised upon Plaintiffs' positions that: 1) the residual pesticides in the soils at MCBH placed Plaintiffs at increased health risks; and 2) Defendants had a duty to warn Plaintiffs about the prior use of now-banned pesticides at MCBH. [First Amended Complaint at ¶¶ 110-12 (Count VI), ¶¶ 108-09 (Count VII), ¶¶ 126-27 (Count VIII).[20]] Because summary judgment has been granted in favor of Defendants as to these issues, Counts VI, VII, and VIII also fail as a matter of law. Defendants are therefore entitled to summary judgment as to those claims.

---

[20] The paragraphs of the First Amended Complaint are misnumbered.

## 2.   **Nuisance**

As previously noted, the Beans' and the Moseleys' nuisance claims have been dismissed with prejudice.  Thus, only the Lakes, Kyle Pahona, and the Wilsons still have nuisance claims ("Nuisance Plaintiffs").  The Nuisance Plaintiffs' claims, have two components: 1) the pesticide-contaminated soil and dust at MCBH constituted a nuisance ("Contamination Nuisance Claims"); [id. at ¶¶ 160-61;] and 2) construction dust at MCBH generally, without regard to the contents of the dust, constituted a nuisance ("Construction Nuisance Claims"), [id. at ¶¶ 159].  For the reasons stated, *supra* Discussion section I.C.1, the Contamination Nuisance Claims fail as a matter of law.  Defendants are therefore entitled to summary judgment as to that portion of Count XI.

As to the Construction Nuisance Claims, expert testimony is not required for the Nuisance Plaintiffs to establish their prima facie case because the issues associated with these claims are within their first-hand knowledge, and a jury would be able to decide those issues without the assistance of expert testimony.  See Barber, 2015 WL 4171984, at *7 ("Plaintiffs are able to present their own testimony that visible dust occurred during Defendants' construction while Plaintiffs were tenants at [MCBH].  Nothing in Hawaii state law

requires an expert opinion in such circumstances." (citing

Yoneda v. Tom, 133 P.3d 796, 814 (Haw. 2006))).  Further, the

Construction Nuisance Claims do not require proof that MCBH was

unsafe and uninhabitable.

This Court has previously stated:

A "nuisance" is defined as:

> . . . that which unlawfully annoys or does
> damage to another, anything that works hurt,
> inconvenience, or damage, anything which
> annoys or disturbs one in the free use,
> possession, or enjoyment of his property or
> which renders its ordinary use or physical
> occupation uncomfortable, and anything
> wrongfully done or permitted which injures
> or annoys another in the enjoyment of his
> legal rights.

Littleton v. State, [66 Haw. 55,] 656 P.2d 1336,
1344 (Haw. 1982) (quoting 58 Am. Jur. 2d
Nuisances § 1 at 555 (1971)).

> . . . A "nuisance" is an activity or
> condition that actively interferes with an
> individual's right to use and enjoy land.  See
> Western Sunview Properties, LLC v. Federman, 338
> F. Supp. 2d 1106, 1116 (D. Haw. 2004) (A nuisance
> "has been defined as 'a nontrespassory invasion
> of another's interest in the private use and
> enjoyment of his land.'") (quoting Layton v.
> Yankee Caithness Joint Venture, 774 F. Supp. 576,
> 577 (D. Nev. 1991)).  The "central idea of
> nuisance is the unreasonable invasion" of a
> property interest.  Lussier v. San Lorenzo Valley
> Water Dist., 206 Cal. App. 3d 92, 100 (Cal. Ct.
> App. 1988). . . .

[Order Granting in Part and Denying in Part Defs.' Motion to

Dismiss, filed 8/1/17 (dkt. no. 63) ("8/1/17 Order"), at 26

(some alterations in 8/1/17 Order).[21]]  It is undisputed that

construction took place in MCBH while the Nuisance Plaintiffs

lived there.  There are genuine issues of material fact as to

whether the dust resulting from the construction unlawfully

disturbed the Nuisance Plaintiffs' free use and enjoyment of

MCBH.  See Littleton, 66 Haw. at 67, 656 P.2d at 1344.  These

issues preclude summary judgment as to the Nuisance Plaintiffs'

Construction Nuisance Claims in Count XI.  Motion 1 is therefore

denied as to that portion of Count XI.

### 3.   Other Hazardous Substances

Plaintiffs' claims in the First Amended Complaint

appear to focus upon pesticide contamination in the soil at

MCBH.  However, to the extent that their claims can be construed

as also alleging they were exposed to other hazardous

substances, besides OCPs, in the soil, Plaintiffs' claims fail

for the same reasons set forth, *supra* Discussion section I.A.

Plaintiffs have not presented sufficient evidence to raise a

triable issue of fact as to the issues of: 1) whether the other

substances contained in the soil were hazardous and rendered

MCBH unsafe and uninhabitable; and 2) whether Defendants had a

---

[21] The 8/1/17 Order is also available at 2017 WL 4563079.
Reconsideration of the 8/1/17 Order was granted in part on
grounds not relevant to the instant Motion in 2017 WL 4560123
(Oct. 12, 2017).

duty to disclose to Plaintiffs information about the allegedly hazardous substances before they entered into their lease agreements.

### D. **Summary**

Motion 1 is denied as to the portion of Count XI asserting claims by the Lakes, Kyle Pahona, and the Wilsons, that construction dust at MCBH – in general and without regard to the contents of the dust – constituted a nuisance. Motion 1 is granted in all other respects.

## II. **Motion 2**

In light of its rulings on Motion 1, this Court is only required to address the issues in Motion 2 as to the Nuisance Plaintiffs' damages for the Construction Nuisance Claims. If the Nuisance Plaintiffs "establish liability and causation at trial and if they present sufficient evidence to establish their damages for the injuries to their [rental] properties, their recovery is limited to . . . expenses actually incurred . . . to remediate the injuries to their properties." See Aana v. Pioneer Hi-Bred Int'l, Inc., CIVIL NO. 12-00231 LEK-BMK, CIVIL NO. 12-00665 LEK-BMK, 2014 WL 12607849, at *3 (D. Hawai`i Dec. 10, 2014). Further, if Kyle Pahona is still residing at MCBH, see *supra* note 2, he is entitled to recover the costs to remediate the injuries to his rental home, as of the time of trial. See Aana, 2014 WL 12607849, at *3.

As another element of actual damages, the Nuisance

Plaintiffs may also seek the return of their rental payments, if

they present evidence that: 1) the construction dust was so

severe, from the outset of their rental term, that they would

not have rented their homes at MCBH if Defendants had disclosed

to them prior to entering into their lease agreements what the

extent of the construction dust would be; or 2) if the

construction dust did not arise until after they were already

living at MCBH, they wanted to terminate their lease agreements,

but Defendants prevented them from doing so.  However, because

the Nuisance Plaintiffs cannot receive a windfall, any recovery

of rental payments must be reduced by the reasonable rent that

they would have paid for other comparable housing during the

same period.  See Tabieros v. Clark Equip. Co., 85 Hawai`i 336,

389-90, 944 P.2d 1279, 1332-33 (1997) ("The general rule in

measuring damages is to give a sum of money to the person

wronged which as nearly as possible, will restore him or her to

the position he or she would be in if the wrong had not been

committed." (brackets, citation, and quotation marks omitted)).

In addition to the foregoing actual damages, the

Nuisance Plaintiffs may also recover special damages.  The

Restatement (Second) of Torts states:

> If one is entitled to a judgment for harm to land
> resulting from a past invasion and not amounting

to a total destruction of value, the damages
include compensation for

. . . .

(b) the loss of use of the land, and

. . . .

(c) discomfort and annoyance to him as an
occupant.

Restatement (Second) of Torts § 929(1). There is no case law
from the Hawai`i appellate courts adopting or rejecting § 929.
This Court must therefore predict how the Hawai`i Supreme Court
would decide the issue. See Trishan Air, Inc. v. Fed. Ins. Co.,
635 F.3d 422, 427 (9th Cir. 2011). This Court has previously
predicted that the Hawai`i Supreme Court would follow
Restatement (Second) of Torts § 822, regarding the elements of a
private nuisance claim. Aana v. Pioneer Hi-Bred Int'l, Inc.,
Civil Nos. 12-00231 LEK-BMK, 12-00665 LEK-BMK, 2015 WL 181764,
at *6-7 (D. Hawai`i Jan. 14, 2015). Consistent with that
prediction, this Court also predicts that the Hawai`i Supreme
Court would follow the Restatement (Second) of Torts regarding
the measure of damages for a nuisance claim. Thus, if the
Nuisance Plaintiffs prevail, and they present a sufficient
factual basis, they would be entitled to recover damages for:
the loss of use and enjoyment of their homes, and of the MCBH
community, caused by the construction dust; and their discomfort
and annoyance caused by the construction dust.

62

Because there are cognizable damages theories for the
Construction Nuisance Claims, Motion 2 is denied, insofar as
Defendants assert they are entitled to summary judgment because:
1) the Nuisance Plaintiffs are unable to prove any damages; and
2) none of the Nuisance Plaintiffs' damages theories are viable.
However, Motion 2 is granted as to Defendants' request for a
ruling limiting the potential recovery of rental payments.

## III. Remaining Issues Regarding Plaintiffs' Other Claims

Although it is unnecessary in light of the rulings on
Motion 1, some of the other issues raised in the Motions will be
addressed for the sake of completeness. Even if Plaintiffs'
claims regarding pesticide-impacted soil did not fail for the
reasons set forth *supra* Discussion section I.A, those claims,
and the evidence in support thereof, would be limited as set
forth below.

### A. Adverse Health Conditions

There has been some testimony about medical issues,
but Plaintiffs have conceded that they will not be presenting
medical evidence, and that they are not seeking damages for
illnesses. See *supra* Background section I.E. Even viewing the
record in the light most favorable to Plaintiffs, Plaintiffs
have failed to present admissible evidence that anything they
were exposed to at MCBH caused those adverse health conditions.
See Weil, 922 F.3d at 998. Therefore, Plaintiffs would not be

allowed to pursue any claim based on adverse health conditions that were allegedly caused by OCPs, other hazardous substances, or construction dust, that Plaintiffs were exposed to at MCBH.

**B.    Plaintiffs' Fear of Adverse Health Effects**

Even though Plaintiffs could not pursue claims based on adverse health effects, they would be allowed to testify about the generalized fear of adverse health effects that they experienced after they learned about the OCP levels in the soil at MCBH.  The experience of such fear is within Plaintiffs' personal knowledge, and the description of such fear does not require specialized knowledge.  See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  However, to the extent this testimony would be based on Plaintiffs' opinions that exposure to OCPs – at the levels which they experienced at MCBH – increased their risk of adverse health effects, Plaintiffs must first satisfy the requirements for the presentation of lay opinion testimony set forth in Fed. R. Evid. 701.  Although Plaintiffs' lay opinion testimony could not be considered for purposes of the instant Motions because they failed to establish the requirements of Rule 701, see *supra* Discussion section I.A.2, if Plaintiffs' OCP-related claims survived

summary judgment, Plaintiffs would have another opportunity to establish the Rule 701 requirements before trial.

## C. __NIED__

It is well-established that, under Hawai`i law, "recovery for negligent infliction of emotional distress by one not physically injured is **generally** permitted only when there is some physical injury to property or [another] person resulting from the defendant's conduct." John & Jane Roes, 1-100 v. FHP, Inc., 91 Hawai`i 470, 474, 985 P.2d 661, 665 (1999) (alteration and emphasis in John & Jane Roes) (citations and internal quotation marks omitted). In the instant case, Plaintiffs have not presented any evidence that any Plaintiff or any Plaintiff's property was injured as a result of: 1) OCPs or other hazardous substances in the soil at MCBH; 2) OCPs or other hazardous substances in the dust at MCBH; or 3) general construction dust at MCBH.

In John & Jane Roes, the Hawai`i Supreme Court recognized an exception to the general rule that an NIED claim requires a physical injury to person or property because the plaintiffs were exposed to blood that had tested positive for the human immunodeficiency virus ("HIV"). Id. at 476-77, 985 P.2d at 667-68. The supreme court stated:

> Exposure to HIV-positive blood "makes the threat of infection much more of a real possibility to be feared and far more than a

65

speculative worry."  <u>Brown [v. N.Y. City Health &</u>
<u>Hosps. Corp.]</u>, 648 N.Y.S.2d [880,] 886 [(App.
Div. 2 1996)] (citation omitted).  As such,
exposure to HIV-positive blood "involve[s]
circumstances which guarantee the genuineness and
seriousness of the claim."  <u>Rodrigues [v. State]</u>,
52 Haw. [156,] 171, 472 P.2d [509,] 519 [(1970)].
Inasmuch as actual exposure to HIV-positive blood
would in fact pose a direct, immediate, and
serious threat to an individual's personal
safety, such exposure would foreseeably engender
serious mental distress in a reasonable
person. . . .

<u>Id.</u> at 476, 985 P.2d at 667 (some alterations in <u>John & Jane</u>

<u>Roes</u>).  Plaintiffs argue this exception should also apply to

their NIED claims because they were subjected to an increased

risk of cancer because of the OCP-levels in the soil and dust at

MCBH.

Initially, it is noted that there is no basis to apply

the <u>John & Jane Roes</u> exception to the portions of Plaintiffs'

NIED claims based upon either: 1) the allegation that OCPs or

other hazardous substances in the MCBH soil and dust exposed

Plaintiffs to adverse health effects other than cancer; or

2) the general construction dust that Plaintiffs experienced at

MCBH.  Nor does the <u>John & Jane Roes</u> exception apply to

Plaintiffs' claims alleging increased cancer risks because no

admissible evidence was presented suggesting that Plaintiffs

were exposed to OCP-levels which were so high that their cancer

risks were "much more of a real possibility to be feared and far

more than a speculative worry."  <u>See</u> <u>id.</u> at 476, 985 P.2d at

667.  Thus, even apart from the issues addressed *supra*

Discussion section I.A, Plaintiffs' NIED claim would fail as a

matter of law.

## CONCLUSION

On the basis of the foregoing, Defendants' Motion for

Summary Judgment No. 1 based upon Plaintiffs' Inability to Prove

a Required Element of their Claims, and Defendants' Motion for

Summary Judgment No. 2 based upon Plaintiffs Inability to Prove

Damages, both filed May 22, 2019, are HEREBY GRANTED IN PART AND

DENIED IN PART.  Motion 1 is GRANTED insofar as summary judgment

is granted in favor of Ohana as to Counts I and II and in favor

of Defendants as to: the remaining portion of Count III;

Counts V, VI, VII, and VIII; and the portion of Count XI that is

based on the nuisance allegedly caused by contaminated soil and

dust.  Motion 1 is DENIED as to the portion of Count XI that is

based on the nuisance allegedly caused by construction dust, in

general and without regard to the contents of the dust.

Motion 2 is DENIED as to Defendants' request for

summary judgment on the ground that: 1) the Nuisance Plaintiffs

are unable to prove any damages; and 2) none of the Nuisance

Plaintiffs' damages theories are viable.  Defendants' alternate

request for rulings limiting the Nuisance Plaintiffs' damages is

GRANTED IN PART AND DENIED IN PART.  Motion 2 is GRANTED,

insofar as: 1) any damages based on the Nuisance Plaintiffs'

rental payments must be supported by the factual basis described in this Order; and 2) Plaintiff's recovery must be reduced by the reasonable rent that they would have paid for other comparable housing during the same period. The remaining requests for rulings limiting Plaintiffs' damages are DENIED AS MOOT, in light of the rulings on Motion 1.

Thus, the only claim remaining for trial is Plaintiffs Kenneth Lake, Crystal Lake, Kyle Pahona, Ryan Wilson, and Heather Wilson's claims asserting that construction dust at MCBH, in general and without regard to the contents of the dust, constituted a nuisance.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, September 30, 2019.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**KENNETH LAKE, ET AL. VS. OHANA MILITARY COMMUNITIES, LLC, ET AL; CV 16-00555 LEK-KJM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT NO. 1 AND NO. 2**